[Cite as *In re L.R.-L.*, 2023-Ohio-2071.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| [In re: L.R.-L., | : | |
| | : | No. 22AP-381 |
| | | (C.P.C. No. 19JU-12209) |
| E.D., Mother, | : | |
| | | (REGULAR CALENDAR) |
| Appellant.] | : | |

D E C I S I O N

Rendered on June 22, 2023

**On brief:** *William T. Cramer*, for appellant.

**On brief:** *Jessica M. Ismond*, for appellee Franklin County Children Services.

APPEAL from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch

LELAND, J.

{¶ 1} Appellant, E.D. ("mother"), appeals a judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, that terminated her parental rights and granted permanent custody of her daughter, L.R.-L., to Franklin County Children Services ("FCCS" or "the agency"). For the following reasons, we affirm.

**I. Facts and Procedural History**

{¶ 2} Mother gave birth to L.R.-L. on July 24, 2019. Mother and L.R.-L.'s father, L.R.-L., III ("father"), were not married at the time of L.R.-L.'s birth. Father established his paternity of L.R.-L. by completing a paternity affidavit.

{¶ 3} Prior to L.R.-L.'s birth, FCCS had removed three of mother's children from her custody. In random drug screens mother completed from August 23 through November 13, 2018, mother consistently tested positive for marijuana. Mother admitted to FCCS that she uses marijuana to relieve stress. Mother did not complete any drug

screens between November 13, 2018 and L.R.-L.'s birth on July 24, 2019. In the months before L.R.-L.'s birth, mother reported to FCCS that she was receiving Suboxone to treat her drug addiction. Mother, however, did not test positive for Suboxone at L.R.-L.'s birth. Instead, when L.R.-L. was born, mother tested positive for marijuana and Oxycodone. L.R.-L. tested positive for Suboxone and Oxycodone, and suffered from withdrawal symptoms, including minor tremors and excessive sucking.

{¶ 4} Two days after L.R.-L.'s birth, FCCS filed a complaint alleging that L.R.-L. was an abused, neglected, and dependent child based on the facts set forth above. FCCS also sought and received an emergency care order for L.R.-L. A magistrate granted FCCS a temporary order of custody for L.R.-L. on July 29, 2019.

{¶ 5} The trial court dismissed the July 26, 2019 complaint because a dispositional hearing did not occur within 90 days of the filing of the complaint as required by R.C. 2151.35(B)(1). FCCS refiled the complaint on October 21, 2019. In addition to the facts alleged in the original complaint, the refiled complaint stated mother had completed 3 drug screens at her drug treatment center after L.R.-L.'s birth. Those screens were positive for Suboxone, noroxycodone, oxycodone, oxymorphone, and marijuana. On September 13, 2019, mother also began screening through American Court Services, and all those drug screens tested positive for Suboxone and marijuana.

{¶ 6} On December 10, 2019, a magistrate held a combined adjudicatory and dispositional hearing regarding L.R.-L. Neither parent attended the hearing. In a decision issued December 30, 2019, the magistrate found that, based on the uncontested facts alleged in the complaint, L.R.-L. was abused as defined in R.C. 2151.031(C) and (D), neglected as defined in R.C. 2151.03(A)(2), and dependent as defined in R.C. 2151.04(C). The magistrate made L.R.-L. a ward of the court and committed her to the temporary custody of FCCS. Finally, the magistrate approved and adopted the case plan, and made the case plan an order of the court. The trial court adopted the magistrate's decision in whole without modification.

{¶ 7} On November 30, 2020, FCCS moved for permanent custody of L.R.-L. The trial court held a hearing on FCCS's motion on May 23 and 24, 2022. Mother, father, the FCCS caseworker assigned to the family, and the guardian ad litem for L.R.-L. testified at that hearing.

{¶ 8}   In a judgment dated June 9, 2022, the trial court granted FCCS permanent custody of L.R.-L.  The trial court found by clear and convincing evidence that, pursuant to R.C. 2151.414(B)(1), L.R.-L. had been in FCCS's custody for 12 months out of a consecutive 22-month period and awarding FCCS permanent custody was in L.R.-L.'s best interest.

## II. Assignments of Error

{¶ 9}   Mother appeals and assigns the following two assignments of error for our review:

> [I.] The agency failed to make intensive efforts to identify and engage kinship caregivers and the juvenile court failed to make the findings necessary to relieve the agency of that obligation.
>
> [II.] The weight of the evidence does not support a grant of permanent custody to the agency.

## III. Analysis

{¶ 10}  By the first assignment of error, mother argues FCCS and the trial court failed to comply with a recently enacted statutory scheme designed to secure kinship caregivers for children who are in FCCS's temporary custody.  We conclude that mother has failed to show any non-compliance that constitutes reversible error.

{¶ 11} R.C. 2151.4115 through 2151.4122 (the "Kinship Caregiver Act") became effective on September 30, 2021.  The Act requires a public children services agency, such as FCCS, to "make intensive efforts to identify and engage an appropriate and willing kinship caregiver for the care of a child who is in [the] [t]emporary custody of the agency." R.C. 2151.4116(A).  A "kinship caregiver" includes individuals related to the child by blood or adoption, such as grandparents or siblings, as well as stepparents and stepsiblings, legal custodians or guardians, and "[a]ny nonrelative adult that has a familiar and long-standing relationship or bond with the child or the family, which relationship or bond will ensure the child's social ties."   R.C. 5101.85(F); R.C. 2151.4115(A)(1) (adopting the definition of "kinship caregiver" in R.C. 5101.85 for application to R.C. 2151.4116 through 2151.4122).

{¶ 12} Once a child is in an agency's temporary custody, the juvenile court must determine at every hearing regarding the child whether the agency has satisfied its duty to use intensive efforts to identify and engage an appropriate and willing kinship caregiver. R.C. 2151.4117.  However, the juvenile court may issue an order relieving the agency of its obligation to exercise intensive efforts if it determines that continuation of the child's

current placement is in the child's best interest and that continued intensive efforts are unnecessary based on the findings in R.C. 2151.4119. R.C. 2151.4118. To issue an order relieving the agency of its statutory obligation under R.C. 2151.4116, the juvenile court must find: (1) "[t]he child has been living in a stable home environment with the child's current caregivers for the past twelve consecutive months," (2) "[t]he current caregivers have expressed interest in providing permanency for the child," and (3) "[t]he removal of the child from the current caregivers would be detrimental to the child's emotional well-being." R.C. 2151.4119(A) through (C). If the juvenile court makes the findings under R.C. 2151.4119, then the juvenile court and the public children services agency "may consider the child's current caregiver as having a kin relationship with the child and at an equal standing to other kin in regards to permanency." R.C. 2151.4120.

{¶ 13} In the case at bar, L.R.-L. entered FCCS's temporary custody on July 29, 2019—over two years before the Kinship Caregiver Act became effective. Nevertheless, FCCS attempted to locate and engage a kinship caregiver for L.R.-L. FCCS considered L.R.-L.'s paternal grandmother, but she informed the agency she was unable to care for L.R.-L. L.R.-L.'s maternal grandmother was already caring for L.R.-L.'s three siblings, and she could not care for a fourth child. L.R.-L.'s maternal grandfather declined a home study, stating he had health issues.

{¶ 14} Although FCCS considered L.R.-L.'s paternal aunt, it rejected her as a possible kinship caregiver because she had an open educational neglect case with FCCS, and she was not compliant with her own case plan. FCCS also rejected a friend of mother's who expressed interest in caring for L.R.-L. Mother did not share the friend's name with FCCS until 2021, when L.R.-L. was in her second year of living with her foster parents. FCCS determined that L.R.-L. had bonded with her foster parents and transferring her to a stranger's care would cause L.R.-L. emotional harm. Consequently, FCCS did not consider placing L.R.-L. with mother's friend.

{¶ 15} Finally, FCCS did not place L.R.-L. with the paternal grandfather's girlfriend. FCCS initially considered the girlfriend a few months after it received temporary custody of L.R.-L., but the girlfriend withdrew from consideration when she and the grandfather separated. In 2021, the now ex-girlfriend again contacted FCCS about caring for L.R.-L. FCCS, however, did not consider the ex-girlfriend as a potential placement for L.R.-L. at

that time. FCCS had the same concerns that it had with mother's friend regarding upsetting L.R.-L.'s emotional well-being. By 2021, L.R.-L. had bonded with her foster parents, and FCCS determined that transferring her to the ex-girlfriend's care would cause emotional harm.

{¶ 16} On appeal, mother contends FCCS violated its obligation under R.C. 2151.4116 because it rejected mother's friend and the ex-girlfriend as kinship caregivers for L.R.-L. in 2021. The record, however, does not clearly establish whether R.C. 2151.4116 was in effect when FCCS considered mother's friend and the ex-girlfriend as caregivers for L.R.-L. As we stated above, the Kinship Caregiver Act did not become effective until September 30, 2021. The caseworker assigned to L.R.-L.'s family testified that FCCS evaluated mother's friend and the ex-girlfriend as potential placements for L.R.-L. in 2021, but she could not pinpoint a more specific date. Consequently, mother failed to prove that the Kinship Caregiver Act yet applied to FCCS when it decided not to place L.R.-L. with mother's friend or the ex-girlfriend.

{¶ 17} Second, mother contends the trial court erred by not making the findings necessary to relieve FCCS of its obligation to exercise intensive efforts under R.C. 2151.4116. We are not persuaded by this argument because the timing of this case made the findings moot.

{¶ 18} The purpose of the Kinship Caregiver Act is to compel agencies to exercise intensive efforts to place children who are in their temporary custody in kinship care rather than in foster care. R.C. 2151.4116. Nevertheless, the Kinship Caregiver Act grants the juvenile court the authority to allow the cessation of efforts to find a kinship caregiver if the court makes certain findings. R.C. 2151.4118. These findings recognize that the time a child spends in the care of foster parents can affect a child's best interest regarding her placement while in FCCS's temporary custody. *See* R.C. 2151.4119(A) through (C).

{¶ 19} Here, the trial court could have made the determination to relieve FCCS from its R.C. 2151.4116 statutory obligation because the court had evidence before it to make all the necessary R.C. 2151.4119 findings. According to the evidence adduced at trial, L.R.-L. had lived in her foster home for over two years, that home was a prospective adoptive home, and FCCS feared that L.R.-L.'s removal from the foster home to live with strangers would harm her well-being.

{¶ 20} This case, however, is complicated by the fact that the Kinship Caregiver Act became effective over two years after L.R.-L. entered FCCS's temporary custody and her foster parents' care. Due to that timing, the issue of FCCS's efforts to find kinship care for L.R.-L. first arose at the permanent custody hearing. Once a child enters the permanent custody of a public children services agency, the question of whether the child should reside in foster care or with a kinship caregiver while the child is in the agency's temporary custody becomes moot. Consequently, the trial court's ruling granting FCCS's motion for permanent custody rendered the question of who would care for L.R.-L. while she was in FCCS's temporary custody moot. The trial court, therefore, did not err by failing to issue an order relieving FCCS of the duty to exercise intensive efforts to identify and engage an appropriate and willing kinship caregiver. Accordingly, we overrule mother's first assignment of error.

{¶ 21} By the second assignment of error, mother argues the trial court's decision to grant permanent custody of L.R.-L. to FCCS is against the manifest weight of the evidence. We disagree.

{¶ 22} An appellate court will not reverse a juvenile court's determination in a permanent custody case unless it is against the manifest weight of the evidence. *In re Andy-Jones*, 10th Dist. No. 03AP-1167, 2004-Ohio-3312, ¶ 28. " 'Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. * * * Weight is not a question of mathematics, but depends on [the evidence's] effect in inducing belief." ' " (Emphasis omitted.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 12, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *Black's Law Dictionary* 1594 (6th Ed.1990). Thus, in reviewing a judgment under the manifest weight standard, an appellate court weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *Id.* at ¶ 20.

{¶ 23} Additionally, in conducting a manifest weight review, an appellate court must make every reasonable presumption in favor of the trial court's judgment and findings of fact. *Id.* at ¶ 21. If the evidence is susceptible to more than one construction, an appellate

court must interpret it in the manner most consistent with the judgment. *Id.* Moreover, " '[t]he discretion which the juvenile court enjoys in determining whether an order of permanent custody is in the best interest of a child should be accorded the utmost respect, given the nature of the proceedings and the impact the court's determination will have on the lives of the parties concerned.' " *In re H.H.*, 10th Dist. No. 19AP-158, 2019-Ohio-4953, ¶ 49, quoting *In re W.D.*, 10th Dist. No. 09AP-589, 2009-Ohio-6903, ¶ 34.

{¶ 24} Parents have a fundamental liberty interest in the care, custody, and control of their children. *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, ¶ 39. However, the right to parent one's children is not absolute; it does not give a parent a right to abuse or neglect a child. *Id.* at ¶ 40. The state has broad authority to intervene to protect children from abuse and neglect. *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 28, citing R.C. 2151.01. An award of permanent custody, which terminates parental rights, is a last resort and is only justified when it is necessary for the welfare of the child. *In re L.B.*, 10th Dist. No. 19AP-644, 2020-Ohio-3045, ¶ 23. Because granting permanent custody terminates parental rights, "parents 'must be afforded every procedural and substantive protection the law allows.' " *In re Hayes*, 79 Ohio St.3d 46, 48 (1997), quoting *In re Smith*, 77 Ohio App.3d 1, 16 (6th Dist.1991).

{¶ 25} A juvenile court may grant permanent custody of a child to a public children services agency "if the court determines * * *, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency * * * and that any of the following apply:"

> (a) * * * [T]he child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
>
> (b) The child is abandoned.
>
> (c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.
>
> (d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *.

(e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

R.C. 2151.414(B)(1)(a) through (e).

{¶ 26} Once the juvenile court concludes that one of the circumstances in R.C. 2151.414(B)(1) applies, the court turns to R.C. 2151.414(D) to decide if a grant of permanent custody is in the child's best interest. Pursuant to R.C. 2151.414(D)(1), in determining a child's best interest, the juvenile court "shall consider all relevant factors, including, but not limited to, the following:"

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D)(1)(a) through (e).

{¶ 27} Here, the trial court found that L.R.-L. met the criteria of R.C. 2151.414(B)(1)(d), as she had been in FCCS's temporary custody for 12 months of a consecutive 22-month period when FCCS moved for permanent custody. After consideration of the R.C. 2151.414(D)(1) factors, the trial court concluded that granting FCCS permanent custody of L.R.-L. was in her best interest. On appeal, mother does not contest the finding that L.R.-L. had been in FCCS's custody for 12 out of 22 months. Rather,

mother only argues the trial court erred in concluding it was in L.R.-L.'s best interest to grant FCCS permanent custody.

{¶ 28} Under the first best-interest factor, the trial court must consider "[t]he interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child." R.C. 2151.414(D)(1)(a). Here, the trial court looked at L.R.-L.'s relationship with her mother, as well as her foster family. According to the caseworker, during visits L.R.-L. and mother play games, color pictures, and watch movies together. L.R.-L. is comfortable with mother; she lets mother hug her and change her diaper or pull-up. The caseworker testified that "there [is] some degree of bonding" between L.R.-L. and mother. (May 23, 2022 Tr. at 160.)

{¶ 29} On the other hand, the caseworker described L.R.-L. as "[c]lose" to her foster mother and father. (May 23, 2022 Tr. at 162.) The guardian ad litem concurred that L.R.-L. and her foster parents share a "strong bond." (May 24, 2022 Tr. at 21.) L.R.-L. calls her foster mother "mom" and her foster father "[d]ad" or "[d]addy." (May 23, 2022 Tr. at 162.) L.R.-L. goes to her foster parents to fulfill her basic needs, which the trial court found demonstrates that she views them as her primary parents and caregivers. L.R.-L. is also close with her foster parents' two biological children, and she takes a tumbling class with her foster sister. The foster home is the only home L.R.-L. has ever known, and it is a prospective adoptive home for L.R.-L.

{¶ 30} Mother asserts that because both she and the foster family have a good relationship and bond with L.R.-L., the first factor "appears to be a draw." (Appellant's Brief at 28.) This assessment of the evidence ignores that the trial court also considered the sporadic nature of mother's visits with L.R.-L. while she was in FCCS's temporary custody. Indeed, in reviewing the first best-interest factor, a court may consider both the bond between the parent and child, and the consistency of a parent's visitation with a child. *In re M.W.*, 10th Dist. No. 19AP-769, 2020-Ohio-5199, ¶ 21.

{¶ 31} In this case, mother failed to consistently visit L.R.-L. The caseworker removed mother from the visitation schedule more than once for missing visits with L.R.-L. Mother wanted FCCS to pay for cab rides to transport her to the visitation center, but she failed to provide the requested documentation from her physician confirming a medical

need for them. In January 2022, mother attended one in-person visit and one virtual visit. In February 2022, mother attended one in-person visit. Mother did not visit with L.R.-L. again before the permanent custody hearing commenced on May 23, 2022.

{¶ 32} Under the second best-interest factor, the trial court must consider "[t]he wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child." R.C. 2151.414(D)(1)(b). Here, the trial court found, in accordance with the guardian ad litem's testimony, that L.R.-L. could not express her wishes due to her young age. At the time of the hearing, L.R.-L. was only two years old. The guardian ad litem recommended the trial court grant FCCS permanent custody of L.R.-L., and she opined that an award of permanent custody to FCCS was in L.R.-L.'s best interest.

{¶ 33} Under the third best-interest factor, the trial court must consider "[t]he custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period." R.C. 2151.414(D)(1)(c). With regard to L.R.-L.'s custodial history, the trial court found L.R.-L. had been in FCCS's temporary custody for 14 months and 3 days when FCCS filed its motion for permanent custody. L.R.-L. had been in FCCS's temporary custody for over 2 years and 6 months when the permanent custody hearing started. In her appellate brief, mother concedes that the third best-interest factor does not favor her because L.R.-L. has spent almost all her life in FCCS's temporary custody.

{¶ 34} Under the fourth best-interest factor, the trial court must consider "[t]he child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency." R.C. 2151.414(D)(1)(d). In considering this factor, the trial court examined whether mother could provide a legally secure permanent placement for L.R.-L.

{¶ 35} The court-ordered case plan required mother to complete certain objectives in order to remedy the conditions that led to L.R.-L.'s removal from mother's custody. Those objectives included: undergoing a mental health assessment and alcohol and other drugs assessment, and following through with any recommendations; completing random drug screens; taking parenting classes; maintaining a relationship with L.R.-L.; and

obtaining appropriate housing and a legal source of income in order to provide for L.R.-L.'s basic needs.

{¶ 36} Mother completed alcohol and other drugs assessments at three different facilities, and all three assessments resulted in a recommendation that she complete drug treatment. Over the years, mother has received medical-assisted drug treatment at four different facilities, but has not completed treatment at any of the facilities. In random drug screens mother completed in 2019 through 2021 at different drug treatment facilities, mother tested positive for drugs mother was not prescribed. Mother also admittedly used marijuana in 2021, and confessed to the caseworker she smoked marijuana to relax.

{¶ 37} Mother's drug treatment was interrupted twice during the period L.R.-L. was in FCCS's temporary custody. On January 4, 2021, L.R.-L.'s father shot mother in her face. Although mother survived the shooting, she had to undergo multiple surgeries to repair the damage caused by the bullet. In March 2021, mother had to leave a ten-day detox program because her physicians did not want her to take both Suboxone for drug treatment and pain medication for her injuries.

{¶ 38} Next, on August 25, 2021, mother robbed a Family Dollar store while high on methamphetamine. Mother was jailed from August 25 to November 4, 2021. On November 4, 2021, mother pled guilty to one count of robbery, a second-degree felony. The Franklin County Court of Common Pleas sentenced mother to four years of community control, and it required mother to complete any behavioral health assessments as determined by the Adult Probation Department and comply with any recommended treatment, as well as submit to random urine screens. If mother violates community control, she will receive an indefinite prison sentence of four to six years.

{¶ 39} The Adult Probation Department required mother to undergo an alcohol and other drugs assessment at Community Medical Services. Since April 2022, mother has attended medical-assisted drug treatment at Community Medical Services as part of her community control.

{¶ 40} Although mother completes random drug screens as required by the Adult Probation Department, mother does not complete random drug screens for FCCS. Mother last completed a random drug screen for FCCS in October 2019.

{¶ 41} The caseworker made multiple referrals so mother could undergo a mental health assessment at Forum Ohio. Mother did not appear for any of the scheduled appointments. Sometime prior to January 8, 2021, mother reported to the caseworker that she was receiving mental health counseling at Access Ohio. Through Access Ohio, mother was receiving medication to treat her depression and anxiety. However, in April 2021, mother terminated all mental health treatment. Mother asserts that in March 2022 she attended an intake appointment for mental health treatment at Southeast Healthcare. Mother is currently waiting for Southeast Healthcare to schedule a mental health assessment for her.

{¶ 42} Mother lives with her father. She has been unemployed since December 2020. According to mother, she is disabled due to the shooting and a car accident that occurred in January 2022. As a result of the shooting, mother is blind in her right eye, and she suffers from balance and memory issues. Mother states the car accident permanently damaged her back and neck. For financial support, mother relies on her family and $250 a month in food stamps. Mother is attempting to obtain disability payments and expects to receive a monetary settlement as a result of the January 2022 car accident. Mother also believes that L.R.-L.'s father would provide her with financial assistance if she received custody of L.R.-L.

{¶ 43} As mother points out in her appellate brief, she has attended parenting classes. Additionally, the home she shares with her father, L.R.-L.'s maternal grandfather, is safe and appropriate for L.R.-L. Mother has purchased a bed and clothing for L.R.-L. Although mother has relapsed, she ultimately returned to drug treatment. In all these respects, mother has complied with the case plan. Moreover, from mother's testimony, it is clear mother loves L.R.-L. and wants to care for her.

{¶ 44} However, a finding that a parent has satisfied some case plan goals does not necessarily equate to a finding that the parent has the ability to assume custody of a child. *In re T.M.*, 10th Dist. No. 18AP-943, 2020-Ohio-815, ¶ 31. That is the problem here. Mother's battle against drug addiction continues unabated, and she has yet to demonstrate that she can maintain her sobriety. Although mother has abundant love for L.R.-L., she still lacks a stable income sufficient to provide for L.R.-L.'s needs, and she has not sustained her mental health treatment.

**{¶ 45}** Looking at all the evidence relevant to the fourth best-interest factor, the trial court found mother could not provide a legally secure permanent placement for L.R.-L. We conclude that the manifest weight of the evidence supports the trial court's finding.

**{¶ 46}** Under the fifth best-interest factor, the trial court must consider "[w]hether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child." R.C. 2151.414(D)(1)(e). The trial court found no R.C. 2151.414(E)(7) through (11) factors applied. Mother concurs.

**{¶ 47}** After weighing all relevant factors, the trial court found that a grant of permanent custody to FCCS was in L.R.-L.'s best interest. The manifest weight of the evidence supports that finding. Accordingly, we overrule the second assignment of error.

**IV. Conclusion**

**{¶ 48}** For the foregoing reasons, we overrule mother's two assignments of error, and we affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.

*Judgment affirmed.*

MENTEL and BOGGS, JJ., concur.

———————————