[Cite as *In re J.C.*, 2025-Ohio-1987.]

COURT OF APPEALS
LICKING COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| IN RE: J.C. | JUDGES:<br>Hon. Craig R. Baldwin, P.J.<br>Hon. William B. Hoffman, J.<br>Hon. Robert G. Montgomery, J.<br><br>Case No. 2025 CA 00001<br><br>O P I N I O N |

| | |
|---|---|
| CHARACTER OF PROCEEDINGS: | Appeal from the Licking County Court of Common Pleas, Juvenile Division, Case No. F2023-0183 |
| JUDGMENT: | Affirmed |
| DATE OF JUDGMENT ENTRY: | June 2, 2025 |
| APPEARANCES: | |

| For Plaintiff-Appellee | For Defendant-Appellant V.G. |
|---|---|
| JENNY WELLS<br>Licking County Prosecuting Attorney | JERMAINE L. COLQUITT<br>Law Offices of Jermaine Colquitt<br>14 N. Park Place<br>Newark, Ohio 43055 |
| KENNETH W. OSWALT<br>Assistant Prosecuting Attorney<br>20 S. Second Street, 4th Floor<br>Newark, Ohio 43055 | Guardian ad Litem |
| For J.C. | CAROLYNN FITTRO<br>35 S. Park Pl., Suite 202<br>Newark, Ohio 43055 |
| ZACHUARY MERANDA<br>33 W. Main Street<br>Newark, Ohio 43055 | |

*Hoffman, J.*

**{¶1}** Appellant V.G. ("Father") appeals the December 20, 2024 Judgment Entry entered by the Licking County Court of Common Pleas, Juvenile Division, which terminated his parental rights and granted permanent custody of his minor child ("the Child") to appellee Licking County Job and Family Services ("LCJFS" or "the Agency")

STATEMENT OF THE FACTS AND CASE

**{¶2}** Father and J.C. ("Mother")[1] are the biological parents of the Child. On May 25, 2023, LCJFS filed a complaint alleging the Child was dependent and/or dependent. LCJFS filed the complaint after receiving information the family was living in a shed without running water or appropriate bathroom facilities. In addition, LCJFS learned Mother, who had a history of drug abuse, was using methamphetamine and selling food stamps for drugs. The Child was not current on his wellness visits or vaccinations. Father also had ongoing substance abuse issues. Father and Mother were both unemployed and lacked stable housing.

**{¶3}** The trial court conducted an emergency shelter care hearing on May 25, 2023, and placed the Child in the temporary custody of LCJFS. The trial court appointed Carolynn Fittro as guardian ad litem ("GAL") for the Child.

**{¶4}** On July 12, 2023, Licking County Child Enforcement Agency issued an administrative order establishing Father's paternity. Thereafter, on July 14, 2023, LCJFS filed a motion to amend the complaint, seeking to dismiss S.C., the legal father who was deceased, and John Doe, putative father, as parties and to reflect Father as the biological

---

[1] Mother is not a party to this appeal.

father of the Child. The trial court granted LCJFS's motion to amend. LCJFS filed its amended complaint on August 1, 2023.

{¶5} At the adjudicatory hearing before the magistrate on July 27, 2023, Father and Mother advised the court they were not contesting the allegations of dependency and neglect. The magistrate found the Child to be dependent and neglected, and immediately proceeded to disposition. The magistrate ordered the Child remain in the temporary custody of LCJFS. The magistrate filed a decision on August 1, 2023, which the trial court approved and adopted as order of the court. See, August 1, 2023 Judgment Entry.

{¶6} The trial court conducted review hearings on October 20, 2023, and April 19, 2024, and maintained the status quo. The trial court made reasonable efforts findings at each hearing. LCJFS filed a motion for permanent custody on April 25, 2024.

{¶7} The trial court conducted a hearing on LCJFS's motion on August 26, 2024. Mother did not appear at the hearing and her whereabouts were unknown.

{¶8} LCJFS intake social worker Brooke Pool testified she made an unannounced visit to the shed in which the family was allegedly living on May 5, 2023. Pool made contact with Father, the Child, and M.G., Father's girlfriend. Father allowed Pool to view the interior of the shed. The shed had electricity, but did not have running water or bathroom facilities. Pool stated Father informed her "they [he and M.G.] had been living there for a year or were homeless for a year," but Pool "was not exactly sure." Transcript of August 26, 2024 Hearing at p. 11.

{¶9} Father and M.G. denied any current substance abuse and each submitted to a drug screen. Father explained Mother dropped the Child off every day, but picked the Child up at night. Father indicated the Child did not sleep in the shed. Father admitted the

Child was not up-to-date on wellness visits or vaccinations, but explained paternity was not established and he did not have any rights to take the Child to a doctor or dentist.

{¶10} Later that same day, Pool met with Mother at a residence in Hegret, Ohio. Mother reported she and the Child were residing in the home. Pool inspected the home and observed a bed and clothing for the Child. Mother denied any current drug use, but did admit she had used marijuana within the week. Mother submitted to a drug screen.

{¶11} Pool received the results of the drug screens on May 10, 2023. Father tested positive for methamphetamine and suboxone. Mother tested positive for methamphetamine and THC. M.G. tested negative for all substances. Pool contacted Father and Mother and requested they meet with her that day to review the results of the drug screens. Father admitted using methamphetamine. After an extensive conversation, Mother ultimately admitted to using methamphetamine. A plan for the Child was created. Because M.G. was negative for all substances, LCJFS allowed her to be the Child's primary caregiver. M.G. was to supervise all visits and contact between Parents and the Child. Father and Mother submitted to drug screens prior to leaving the Agency. M.G. accompanied Parents and the Child to an Urgent Care where the Child had a wellness check.

{¶12} On May 15, 2023, Pool received the results of the May 10, 2023 drug screens. Father and Mother again tested positive for methamphetamine. Pool visited Father at the shed. Father denied any drug use. Pool requested Father work with an LCJFS drug and alcohol case manager. Pool discussed Father's current housing situation. Pool instructed M.G. to contact Metro Housing to be added to the waitlist as well as the Salvation Army to check availability. Pool noted M.G. did not contact Metro

Housing. Father could not take the Child to the Salvation Army because he did not have custody. Father resisted leaving the shed because all of his belongings were at the property. Father "was still working on getting his disability situation figured out," but M.G. was not willing to work due to her weight. Tr. at p. 15. Pool referred Father and M.G. to Ohio Means Jobs.

{¶13} Pool met with Mother on May 19, 2023, to discuss possible placement options. Pool explained M.G. was not working out because of the lack of stability in her own life. Mother provided Pool with the name of a family friend. Pool subsequently spoke with Mother's friend, but the individual was unable to take the Child full-time and wanted to "split responsibilities with his sister and other people." Tr. at p. 17. Pool explained LCJFS would need to conduct a more in-depth home study. LCJFS filed its complaint on May 25, 2023, due to the lack of independent housing, lack of employment and income, and Mother's history with Franklin County involving other children.

{¶14} Matthew Tracy, an ongoing social worker with LCJFS, testified he was assigned to the family on October 27, 2023. Father's case plan required him to address his substance abuse. When Tracy received the case, Father was involved with Licking County Alcoholism Prevention Program ("LAPP"). Father did not attend consistently and stopped attending completely in December, 2023. The counselor subsequently terminated him due to lack of progress. Father admitted he continued to use methamphetamine. Tracy had a number of conversations with Father about inpatient treatment, but Father indicated he was not ready. As of the date of the permanent custody hearing, Father had not started treatment. Father tested positive for methamphetamine at his last drug screen on July 18, 2024.

**{¶15}** Father was also required to obtain and maintain income. On November 27, 2023, Father advised Tracy he had applied for Social Security, but, as of the date of the permanent custody hearing, Father was not receiving any benefits. Father was unemployed throughout LCJFS's involvement. Tracy did not believe Father could meet the Child's financial needs unless he received Social Security benefits. In April, 2024, M.G. moved into an apartment in Newark. Father remained living in the shed until shortly before the permanent custody hearing. Father consistently visited the Child. Father was engaged with the Child during the visits.

**{¶16}** Tracy testified the Child has speech issues and was attending speech therapy. When the Child was removed from Mother's home, he had significant dental issues as Parents had not taken the Child to the dentist. According to Tracy, the Child had at least eight (8) cavities. The Child was not current with his vaccinations at the time of his removal. The Child has been in the same foster placement since his removal. The foster father takes good care of the Child. The Child is bonded with the foster father. The Child is involved in many different sports. The Child is more relaxed in his foster home than he is during visits with Parents.

**{¶17}** With regard to kinship placement, Tracy explained Mother only recently provided the name of K.C., her mother ("Maternal Grandmother"). LCJFS sent paperwork to Maternal Grandmother. Tracy spoke with Maternal Grandmother twice, attempting to set up a home study, however, she did not respond. Maternal Grandmother does not have a relationship with Mother and had not seen the Child since he was two-years old.

**{¶18}** F.D., the Child's foster father, testified the Child was "scared, very retracted, very silent, very reliant on me" and "was scared to go anywhere alone or be by himself."

Tr. at p. 66. F.D. stated the Child is now more independent. F.D. described the Child as "amazing" and "a great kid." F.D. added the Child has adapted very well. The Child enjoys F.D.'s nieces and nephews as well as the rest of F.D.'s large extended family. F.D.'s cousin and grandmother also live in F.D.'s home. The Child recently started first grade and was doing well. The Child attended speech therapy for five (5) months and is now able expresses his wants and needs. F.D. indicated he intends to adopt the Child if the court granted permanent custody to LCJFS.

**{¶19}** The GAL filed her written report and recommendations on August 19, 2024, and testified at the hearing. The GAL testified she recommended granting permanent custody of the Child to LCJFS. The GAL explained part of her recommendation was based upon Father and Mother's lack of progress on their respective case plans as well as their failure to alleviate the concerns which led to the initial removal of the Child. The GAL specifically noted Parents' continued drug use, homelessness, and financial instability. In addition, the GAL believed granting permanent custody was in the Child's best interest. The GAL described the positive changes she observed in the Child.

**{¶20}** Father testified he received $1,000.00/month in Social Security benefits. Father indicated he began receiving Social Security in July, 2023, and informed the caseworker of this fact. Father detailed the progress he had made on his case plan. Father moved into his apartment in March, 2024. The Child has his own bedroom. Father was managing his headaches with the help of his doctor and no longer self-medicates with methamphetamine. Father explained he was not able to complete treatment due to a lack of transportation.

{¶21} Via Judgment Entry filed December 20, 2024, the trial court terminated Father and Mother's parental rights with respect to the Child and granted permanent custody of the Child to LCJFS. The trial court found the Child could not and should not be placed with either Father or Mother within a reasonable time. The trial court further found it was in the best interest of the Child to grant permanent custody to LCJFS.

{¶22} It is from this judgment entry Father appeals, raising the following assignments of error:

I. THE TRIAL COURT ERRED IN GRANTING PERMANENT CUSTODY BECAUSE THE AGENCY FAILED TO MAKE INTENSIVE EFFORTS TO IDENTIFY AND ENGAGE A SUITABLE AND WILLING KINSHIP CAREGIVER FOR J.C. R. AT 96.

II. THE TRIAL COURT ERRED IN FINDING THAT J.C. CANNOT BE PLACED WITH HIS FATHER WITHIN A REASONABLE TIME OR SHOULD NOT BE PLACED WITH HIS FATHER, AND IN CONCLUDING THAT PERMANENT CUSTODY WITH THE AGENCY IS IN J.C.'S BEST INTEREST. R. 96.

{¶23} This case comes to us on the expedited calendar and shall be considered in compliance with App. R. 11.2(C).

I

{¶24} In his first assignment of error, Father submits the trial court erred in granting permanent custody to LCJFS as the Agency failed to make intensive efforts to

identify and engage a suitable and willing kinship caregiver for the Child in compliance with the Kinship Caregiver Law.

**{¶25}** We note Father did not raise the Kinship Caregiver Law to the trial court; therefore, he has forfeited all but plain error. *In re De.D.*, 2020-Ohio-906, ¶ 13 (8th Dist.). ("It is well-established that failure to object to an issue in the lower court waives a party's right to challenge that issue on appeal absent plain error."). "Plain error exists only when it can be determined that the outcome of the trial would have been different." *In re S.F.*, 2023-Ohio-1900, ¶ 15 (8th Dist.), citing *In re Z.T.*, 2007-Ohio-827, ¶ 19 (8th Dist.).

**{¶26}** The Kinship Caregiver Law, set forth in R.C. 2151.4115 through 2151.4122, became effective on September 30, 2021. *See* 2021 Am.Sub.H.B. No. 110. The law requires a public children services agency, such as CCDCFS, to "make intensive efforts to identify and engage an appropriate and willing kinship caregiver for the care of a child who is in [the] *[t]emporary* custody of the agency." (Emphasis added.) R.C. 2151.4116(A). A "kinship caregiver" includes individuals related to the child by blood or adoption, such as grandparents or siblings, as well as stepparents and stepsiblings, legal custodians or guardians, and "[a]ny nonrelative adult that has a familiar and long-standing relationship or bond with the child or the family, which relationship or bond will ensure the child's social ties." R.C. 2151.4115(A)(1) (adopting the definition of "kinship caregiver" in R.C. 5101.85 for application to R.C. 2151.4116 through 2151.4122).

**{¶27}** This law requires the juvenile court to determine at every court hearing "whether the public children services agency * * * has continued intensive efforts to identify and engage appropriate and willing caregivers for the child." R.C. 2151.4117(A).

**{¶28}** A review of the trial court record in this matter reveals the trial court made the appropriate finding at each semi-annual review hearing. See, Record at 56 and 60. Moreover, LCJFS's Semiannual Administrate Review reports reflect LCJFS continued to search for "a fit and willing relative or kin" for placement. LCJFS also indicated neither Father nor Mother had "identified any willing and appropriate relatives and/or kin to care for" the Child. October 20, 2023 Semiannual Administrative Review at p. 4, unpaginated.

**{¶29}** Further, because the law applies during an agency's exercise of temporary custody over a child, "[o]nce a child enters the permanent custody of a public children services agency, the question of whether the child should reside in foster care or with a kinship caregiver while the child is in the agency's temporary custody becomes moot." *In re L.R.-L.*, 2023-Ohio-2071, ¶ 20 (10th Dist.); *In re A.M.,* 2024-Ohio-1164, ¶ 62 (8th Dist.). Accordingly, we find no plain error.

**{¶30}** Father's first assignment of error is overruled.

II

**{¶31}** In his second assignment of error, Father asserts the trial court erred in finding the Child could not be placed or should not be placed with Father within a reasonable time and in concluding granting permanent custody to LCJFS was in the Child's best interest.

**{¶32}** As an appellate court, we neither weigh the evidence nor judge the credibility of the witnesses. Our role is to determine whether there is relevant, competent and credible evidence upon which the fact finder could base its judgment. (Citation omitted.) *In re D.R.*, 2024-Ohio-1819, ¶28 (5th Dist.). Accordingly, judgments supported by some competent, credible evidence going to all the essential elements of the case will

not be reversed as being against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Constr.*, 54 Ohio St.2d 279, syllabus (1978).

**{¶33}** R.C. 2151.414 sets forth the guidelines a trial court must follow when deciding a motion for permanent custody. R.C. 2151.414(A)(1) mandates the trial court schedule a hearing and provide notice upon the filing of a motion for permanent custody of a child by a public children services agency or private child placing agency that has temporary custody of the child or has placed the child in long term foster care.

**{¶34}** Following the hearing, R.C. 2151.414(B) authorizes the juvenile court to grant permanent custody of the child to the public or private agency if the court determines, by clear and convincing evidence, it is in the best interest of the child to grant permanent custody to the agency, and that any of the following apply: (a) the child is not abandoned or orphaned, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents; (b) the child is abandoned; (c) the child is orphaned and there are no relatives of the child who are able to take permanent custody; or (d) the child has been in the temporary custody of one or more public children services agencies or private child placement agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999.

**{¶35}** Therefore, R.C. 2151.414(B) establishes a two-pronged analysis the trial court must apply when ruling on a motion for permanent custody. In practice, the trial court will usually determine whether one of the four circumstances delineated in R.C. 2151.414(B)(1)(a) through (d)is present before proceeding to a determination regarding the best interest of the child.

**{¶36}** If the child is not abandoned or orphaned, the focus turns to whether the child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents. Under R.C. 2151.414(E), the trial court must consider all relevant evidence before making this determination. The trial court is required to enter such a finding if it determines, by clear and convincing evidence, that one or more of the factors enumerated in R.C. 2151.414(E)(1) through (16) exist with respect to each of the child's parents.

**{¶37}** We review a trial court's best interest determination under R.C. 2151.414(D) for an abuse-of-discretion. *In re D.A.*, 8th Dist. Cuyahoga No. 95188, 2010-Ohio-5618, ¶ 47. A trial court's failure to base its decision in consideration of the best interest of the child constitutes an abuse-of-discretion. *In re R.S.*, 2022-Ohio-4387, ¶ 45 (8th Dist.), quoting *In re N.B.*, 2015-Ohio-314, at ¶ 60 (8th Dist.). "The term 'abuse-of-discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

**{¶38}** In determining the best interest of the child at a permanent custody hearing, R.C. 2151.414(D)(1) mandates the trial court must consider all relevant factors, including, but not limited to, the following: (a) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (b) the wishes of the child as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (c) the custodial history of the child; (d) the child's need for a legally secure permanent placement and whether that type of placement can be achieved

without a grant of permanent custody; and (e) whether any of the factors in division (E)(7) to (11) of R.C. 2151.414 apply in relation to the parents and child.

{¶39} Father challenges the trial court's finding the Child could not and should not be placed with Father within a reasonable time as the evidence established he made substantial progress on his case plan objectives and reunification was achievable. Father also challenges the trial court's finding permanent custody was in the best interest of the Child, arguing LCJFS failed to fully explore kinship placements and a legally secure placement could have been achieved without resorting to permanent custody.

{¶40} As set forth in our Statement of the Case and Facts, supra, Father failed to comply with his case plan. Father failed to address his substance abuse issues. Father began treatment with LAPP, however, he was discharged unsuccessfully due to missed appointments and lack of progress. Father admitted he continued to use methamphetamine. Matthew Tracy, the ongoing case worker, repeatedly spoke with Father about inpatient treatment, but Father indicated he was not ready. As of the date of the permanent custody hearing, Father had not started treatment. Father tested positive for methamphetamine at every drug screen from the inception of the case in May, 2023, through July 18, 2024.

{¶41} Father was also required to obtain and maintain income, and obtain and maintain stable housing. Although Father advised Tracy he had applied for Social Security, Tracy stated Father never informed him he (Father) had started receiving benefits. During his direct examination, Father indicated he had been receiving Social Security benefits "for over a year." Tr. at p. 74. Father initially insisted he had advised Tracy he was receiving benefits, but subsequently admitted he "believed" or "thought" he

had provided the information to Tracy.  In April, 2024, M.G. moved into an apartment in Newark.  Father remained living in the shed until shortly before the permanent custody hearing.

**{¶42}**  The Child has been placed with his Foster Father since May, 2023. Foster Father ensures all of the Child's needs are met. The Child is bonded with Foster Father and his extended family.  Foster Father wishes to adopt the Child.  Three (3) days before the permanent custody hearing, Mother provided LCJFS with Maternal Grandmother's name as a possible placement.  LCJFS sent paperwork to Maternal Grandmother. Tracy spoke with Maternal Grandmother twice, attempting to set up a home study, however, she did not respond. Maternal Grandmother does not have a relationship with Mother and had not seen the Child since he was two-years old. Neither Father nor Mother provided LCJFS with any other relative or kinship person to be considered for placement of the Child.

**{¶43}**  Based upon the foregoing, we find the trial court's finding the Child could not and should not be placed with Father in a reasonable time was supported by competent, credible evidence and was not against the manifest weight of the evidence. We further find the trial court's finding it was in the Child's best interest to grant permanent custody to LCJFS was not against the manifest weight of the evidence.

**{¶45}** Father's second assignments of error is overruled.

**{¶46}** The judgment of the Licking County Court of Common Pleas, Juvenile Division, is affirmed.

By: Hoffman, J.

Baldwin, P.J. and

Montgomery, J. concur