[Cite as *In re A.M.*, 2024-Ohio-1164.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| IN RE A.M. | : | 113083 |
| A Minor Child | : | |
| [Appeal by R.W., Mother] | : | |

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** March 28, 2023

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD19914470

---

### *Appearances:*

Law Office of Anthony J. Richardson II, LLC, and Anthony J. Richardson II, *for appellant*.

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Zachary J. Lafleur, Assistant Prosecuting Attorney, *for appellee.*

MICHELLE J. SHEEHAN, P.J.:

{¶ 1} Appellant, R.W. ("mother"), appeals from a judgment of the Cuyahoga County Juvenile Court granting permanent custody of her child, A.M. (referred to as "A.M." or "the child"), born March 2012, to the Cuyahoga County Division of

Children and Family Services ("agency" or "CCDCFS").  Mother raises four assignments of error for our review:

> 1. The juvenile court abused its discretion and erred in granting permanent custody to the Agency and denying Appellant-Mother's motion for legal custody to the Aunt because the Agency failed to engage in intensive efforts to place the Child with her Aunt.
>
> 2. The juvenile court abused its discretion and erred in denying Appellant-Mother's motion for legal custody to the Aunt because an award of legal custody to the Aunt is supported by a preponderance of the evidence.
>
> 3. The trial court erred in granting permanent custody to the Agency because the trial court's judgment is not supported by clear and convincing evidence.
>
> 4. The trial court committed error by terminating appellant and [A.M.'s] familial rights, where Ohio statutes would be unconstitutional as applied.[1]

{¶ 2} After review, we find that the juvenile court did not commit reversible error with respect to the Kinship Caregiver Law that went into effect during the pendency of this case.  We further find that the juvenile court did not err when it granted permanent custody to CCDCFS and denied mother's motion to award legal custody to maternal aunt.  Finally, we find that mother did not prove by clear and convincing evidence that R.C. Chapter 2151 was unconstitutional as applied to her.  We therefore affirm the juvenile court's judgment.

---

[1] Mother raised her fourth assignment of error in a supplemental brief.

## I. Procedural Background and Facts

{¶ 3} In December 2019, A.M. and her three younger siblings were removed from mother's care pursuant to an ex parte telephonic order after the youngest child, born in September 2019, was diagnosed with abusive head trauma, including a skull fracture, bilateral retinal hemorrhages, and multiple hematomas on her brain. Due to these injuries, the youngest child began having seizures. Doctors determined that the injuries were not accidental. Doctors also discovered that the youngest child had older injuries that were in various stages of healing, including clavicle and rib fractures. Mother could not explain how the youngest child obtained any of the injuries, despite being her primary caregiver.[2]

{¶ 4} CCDFCS subsequently filed a complaint alleging that the children were abused and neglected and requesting temporary custody be granted to the agency. The agency alleged that mother failed to seek medical treatment when the youngest child's injuries became apparent. The juvenile court appointed a guardian ad litem for the children.

{¶ 5} The juvenile court held an adjudicatory hearing on January 22, 2020, and found the children to be abused and neglected. After the dispositional hearing approximately one month later, the court awarded temporary custody of the children to the agency.

---

[2] Mother ultimately pleaded guilty to attempted child endangering and was sentenced to ten months in prison on January 2021. After mother pleaded guilty and was sentenced, she was supposed to report to authorities the following day. However, mother did not do so and absconded for eight months. Mother was released from prison in June 2022.

{¶ 6} In March 2021, the agency moved for permanent custody of the children.

{¶ 7} In May 2022, A.M.'s father moved for legal custody of her. According to the guardian ad litem's report filed in May 2022, the child's father lived in Alabama. The child's father was not involved in her life since she was approximately two years old; at the time he filed his motion, she was ten years old. Although the father had six Zoom visits with the child once he learned about this case, by the time of the permanent custody hearing, he had not been in contact with the child, guardian ad litem, or social worker for over a year.

{¶ 8} In May 2022, mother filed a motion requesting that the court grant legal custody of A.M. to maternal aunt who lived in Chicago. Maternal aunt appeared for a court hearing in May 2022 and signed a "Legal Custodian Statement of Understanding for Legal Custody" of the child.

{¶ 9} Around the time that mother moved for legal custody to maternal aunt, the guardian ad litem moved for the court to hold an in camera interview of the child. The guardian ad litem also moved for the court to appoint an attorney for the child due to a possible conflict between the child's wishes and the guardian ad litem's recommendation. According to the guardian ad litem's motion, the child wished to live with her father at that point. The juvenile court appointed an attorney for the child immediately but held the motion for an in camera interview in abeyance.

{¶ 10} The juvenile court held a hearing on the agency's permanent custody motion and mother's motion for legal custody to maternal aunt in September 2022.

Maternal aunt testified at the hearing that she was willing and able to take legal custody of the child. The court continued the case so that it could interview the child, which it did on October 14, 2022. The juvenile court subsequently denied the agency's permanent custody motion with respect to A.M.[3] The court explained that maternal aunt had been identified for potential placement of the child, but that pre-placement visits had not yet occurred. The court further noted that the "child expressed fond memories of her aunt prior to her removal from mother."

{¶ 11} In December 2022, the agency moved for permanent custody a second time. The guardian ad litem filed his updated report and recommendation on June 14, 2023. The guardian ad litem stated that as of April 2023, the child wished to be placed with her maternal aunt. Despite the child's wishes, the guardian ad litem recommended that the court grant permanent custody of the child to the agency.

{¶ 12} On June 15, 2023, mother also filed a "Motion for Placement with Maternal Aunt, [A.H.], as an Alternative to Legal Custody to [A.H.], Maternal Aunt."

{¶ 13} In June 2023, the juvenile court held a hearing on the agency's permanent custody motion as well as mother's motion requesting legal custody be awarded to maternal aunt or in the alternative, that the child be placed with maternal aunt.

---

[3] The juvenile court granted the agency's request for permanent custody regarding mother's other three children in October 2022.

## A. Permanent Custody Hearing[4]

{¶ 14} The child's attorney informed the juvenile court that the child wished to live with her aunt.

{¶ 15} The social worker assigned to the case since September 2022 testified that when the child was removed from mother's care, the goal was to reunify her with mother. However, due to the conditions of mother's parole, mother could only have supervised visitation with the child. At the time of the permanent custody hearing, mother had two more years of parole. The social worker stated that mother met all the other goals of her case plan, including obtaining stable housing and establishing that she could meet the child's basic needs.[5] Mother had also been compliant with her parole until March 2023, when mother was charged with theft. Mother also showed up for a visit with the child in May 2023 under the influence of marijuana.

{¶ 16} From December 2019, when she was removed from mother's care, to November 2020, the child had been placed in three different foster homes due to her severe behavioral issues. But since November 2020, the child had been in the same foster home. Although her adjustment to the current foster home was "rocky" at first, she was doing significantly better at the time of trial.

---

[4] Some background facts come from the guardian ad litem's report.

[5] Mother's original case plan required her to complete an anger management program, a parenting class, a mental health assessment, a drug treatment program, obtain housing, and meet the child's basic needs. As of the time of the first permanent custody hearing in September 2022, mother had completed those requirements except for housing.

{¶ 17} The child had been diagnosed with oppositional defiant disorder, attention-deficit/hyperactivity disorder, anxiety, depression, and post-traumatic stress disorder. The child's therapist suspected that the child had previously been abused and experienced severe trauma from that abuse.

{¶ 18} Mother did not visit the child before September 2022. But the social worker testified that since September 2022, mother had been consistently visiting the child for two hours every Monday. Mother had been appropriate at the visits. Since mother had been visiting the child, the child's behavior had greatly improved. The social worker also attributed that improvement to counseling and a stable placement with foster mother.

{¶ 19} The social worker testified that the child was bonded with the foster mother. The social worked further explained that the child was "seen as not a foster kid, but another branch of the family." The foster mother's mother treats the child as her own grandchild, and the child refers to her as "grandma." The child also gets along with the other children in the home and told the social worker that they were "one big happy family." The child was also doing "excellent in school."

{¶ 20} The social worker testified that the foster mother wants to adopt the child. The foster mother is also willing to continue the relationship between the child and mother as long as mother is stable because she knows that the child's behavior improved once mother began consistently visiting her.

{¶ 21} The social worker stated that when she last met with the child, which was a few weeks before trial, the child wanted to live with maternal aunt. But the

social worker stated that the child does not consistently say that she wants to live with her aunt. The child had also stated that she wanted to remain with foster mother. The social worker testified that due to the child's age (she was 11 years old at the time of trial), she sometimes wanted to live with the person who last gave her gifts.

{¶ 22} Regarding maternal aunt, the social worker testified that an Interstate Compact on Placement ("ICPC") of Children was completed in January 2023. The ICPC includes an extensive background check and home study. The social worker stated that maternal aunt was approved for relative placement in January 2023, but the juvenile court denied mother's oral request for the child to immediately move to Chicago at that time.

{¶ 23} The social worker stated that after the September 2022 hearing, the agency did not place any restrictions on the aunt's visitation or communication with the child. The social worker had also given maternal aunt her agency cell phone number, her desk phone number, and foster mother's cell phone number. Despite that, maternal aunt had only visited the child three times between September 2022 and the hearing in June 2023. Maternal aunt also had no communication with the child between the September 2022 hearing and late January 2023, when she first visited the child, nor did maternal aunt communicate with the child between the other two visits.

{¶ 24} The social worker explained that for the first visit, maternal aunt had four hours to spend with the child before the social worker had to take her back to

the foster mother's home. The aunt took the child out to lunch and to shop at Steelyard Commons. But after two-and-a-half hours, the aunt called the social worker and stated that "she was ready to go." However, the aunt testified that the child wanted to end the visit because she was cold.

{¶ 25} Maternal aunt also visited the child a second time in March 2023, around the time of the child's birthday, and then a third time the day before the permanent custody hearing. The aunt took the child to Dave and Buster's for the second visit and to dinner and a movie for the third visit.

{¶ 26} The social worker testified that the agency had concerns about the child moving to Chicago because she would be far from her siblings. The agency also had concerns about maternal aunt's commitment to the child. In addition to visiting the child only three times in nine months, the aunt essentially had no contact with the child outside of those visits. The social worker explained that the agency had concerns about maternal aunt having legal custody of the child when the aunt had not made more of an effort to visit or communicate with the child when she had plenty of time and opportunity to do so. The social worker explained that due to the child's diagnoses and past behavioral issues, she needed someone who would take the time to address those issues.

{¶ 27} The social worker testified that the child needs a legally secure and permanent placement. The social worker believed that would best happen if the agency received permanent custody of the child. But the social worker agreed on cross-examination that the "real reason" the child could not be returned to mother

was because of the conditions of mother's parole. The social worker also stated that if the agency received permanent custody, maternal aunt could still pursue adoption of the child.

{¶ 28} Maternal aunt testified that she was a Certified Nursing Assistant. She worked from 7:00 a.m. to 3:00 p.m. on Mondays, Wednesdays, and Fridays, and every other weekend. She earned $25.50 per hour. Maternal aunt also worked seasonally at the United Center, where the Chicago Bulls and Chicago Blackhawks play. When she worked at the United Center, she usually worked Mondays, Wednesdays, and Fridays, and one weekend per month. She earned $26.04 per hour at the United Center.

{¶ 29} Maternal aunt stated that in addition to the ICPC being completed, she had completed foster parent classes to become a licensed foster parent. Although she had completed the classes, a home study still needed to be done. Once the home study was completed, she would have her license.

{¶ 30} Maternal aunt stated that before the child was removed from mother's care, she saw the child approximately three to four times each year since the child was born. She stated that she loved her niece, but they had to "rekindle" their relationship during the visits because the child was shy.

{¶ 31} Maternal aunt wanted custody of the child, and she would be interested in adopting her. The aunt signed a second "Legal Custodian's Statement of Understanding for Legal Custody," which was entered into evidence. Maternal

aunt obtained a two-bedroom apartment in September 2022 so that her niece could come and live with her.

{¶ 32} Maternal aunt explained that she would try to call her niece but because of the hour time change, she sometimes forgot. Maternal aunt said she texted the foster mother on the child's birthday so that she could talk to the child and the foster mother allowed them to talk. Maternal aunt further stated that she did not visit the child in April or May because she was busy trying to get her house ready for the child to come and live with her.

{¶ 33} The aunt could not explain why she did not try to communicate with the child between December 2019, when the child entered temporary custody, until the aunt became involved in the case in September 2022. Maternal aunt stated that she got the "run around" when her niece first went into temporary custody of the agency. The aunt also did not have an answer when asked why she did not visit the child between September 2022 and late January 2023. The aunt explained that she did call the social worker once in December 2022 to try to plan a visit, but the aunt could not get a train ticket in December. When asked what kind of communication she had attempted between the child's birthday in March and the hearing in June 2023, the aunt stated, "one or two calls." But then the aunt admitted that she had tried to call but it went to voicemail. The aunt also expressed frustration because she did not know the child's schedule.

{¶ 34} Maternal aunt admitted when questioned by the guardian ad litem that after the hearing in September 2022, she was aware that the agency and the

guardian ad litem "were wondering if [she was] going to show more commitment to the child." The guardian ad litem further asked the aunt if she was aware "that was being asked of [her]." Maternal aunt responded that she was aware but that she "was waiting for information." Maternal aunt also stated that she did not know she was allowed to call her niece.

{¶ 35} The guardian ad litem testified that he had been involved with the case for three-and-a-half years. He knows the child. He knows the social workers. He said the social worker was credible and had worked with this child. Although the guardian ad litem reported that when he last spoke to the child in April 2023, she wanted to live with her aunt, the guardian ad litem recommended that the agency receive permanent custody of the child. He said that he did not trust mother or maternal aunt. He opined that maternal aunt had not shown enough commitment or consistency to demonstrate that she could protect the child from mother. He believed that maternal aunt would give mother too much access to the child.

{¶ 36} The guardian ad litem further stated that the child had made a lot of progress in the two-and-a-half years she had been in her current placement. The guardian ad litem said that he believed it would be "detrimental" to uproot the child from her placement. The guardian ad litem testified that the child needed permanency, and the best way for that to happen was to grant permanent custody to the agency.

**B. Juvenile Court's Judgment**

{¶ 37} After the hearing, the juvenile court granted permanent custody to the agency and denied mother's motions for legal custody to or placement with maternal aunt. We will address the court's specific findings within the relevant analysis sections of this opinion.

## II. Burdens and Standards of Review

{¶ 38} In this case, the trial court resolved three motions: the agency's motion for permanent custody and mother's motion for legal custody to maternal aunt, or alternatively, placement with maternal aunt.

### A. Permanent Custody Standard

{¶ 39} The right to raise one's own child is "'an essential and basic civil right.'" *In re N.B.*, 8th Dist. Cuyahoga No. 101390, 2015-Ohio-314, ¶ 67, quoting *In re Hayes*, 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997). Before parents' constitutionally protected liberty interest in the care and custody of their child may be terminated, the state must prove by clear and convincing evidence that the statutory requirements for permanent custody under R.C. 2151.414 have been met. *In re K.W.*, 12th Dist. Butler No. CA2015-06-124, 2015-Ohio-4315, ¶ 11, citing *Santosky v. Kramer*, 455 U.S. 745, 769, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982).

> Clear and convincing evidence is that measure or degree of proof which is more than a mere "preponderance of the evidence," but not to the extent of such certainty as is required "beyond a reasonable doubt" in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.

*Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

{¶ 40} The Ohio Supreme Court recently clarified the standard of review in permanent custody cases. *In re Z.C.*, Slip Opinion No. 2023-Ohio-4703. It held:

> Given that R.C. 2151.414 requires that a juvenile court find by clear and convincing evidence that the statutory requirements are met, we agree with those appellate courts that have determined that the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards of review are the proper appellate standards of review of a juvenile court's permanent-custody determination, as appropriate depending on the nature of the arguments that are presented by the parties.

*Id.* at ¶ 11.

{¶ 41} Although the sufficiency and manifest weight standards are well known, we quote *In re Z.C.* setting forth the standards in their entirety, to emphasize the latter part of the manifest weight standard — that is, to highlight that we must *still* give deference to the trial court when reviewing for manifest weight of the evidence:

> Sufficiency of the evidence and manifest weight of the evidence are distinct concepts and are "'both quantitatively and qualitatively different.'" *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 10, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997), paragraph two of the syllabus. We have stated that "sufficiency is a test of adequacy," *Thompkins* at 386, while weight of the evidence "'is not a question of mathematics, but depends on its *effect in inducing belief*'" (emphasis sic), *id.* at 387, quoting *Black's Law Dictionary* 1594 (6th Ed.1990). "Whether the evidence is legally sufficient to sustain a verdict is a question of law." *Id.* at 386. "When applying a sufficiency-of-the-evidence standard, a court of appeals should affirm a trial court when "'the evidence is legally sufficient to support the jury verdict as a matter of law.'"" *Bryan-Wollman v. Domonko*, 115 Ohio St.3d 291, 2007-Ohio-4918, 874 N.E.2d 1198, ¶ 3, quoting *Thompkins* at 386, quoting *Black's* at 1433.

But "even if a trial court judgment is sustained by sufficient evidence, an appellate court may nevertheless conclude that the judgment is against the manifest weight of the evidence." *Eastley* at ¶ 12. When reviewing for manifest weight, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *Id*. at ¶ 20. "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." *Id*. at ¶ 21. "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). "'If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.'" *Id*. at fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191-192 (1978).

*In re Z.C.* at ¶ 13-14.

### B. Legal Custody

{¶ 42} Because legal custody is a less drastic remedy than permanent custody, the trial court applies a less stringent evidentiary standard. "Unlike in a permanent custody proceeding, where an agency's burden is by clear and convincing evidence, the standard in legal custody proceedings is a preponderance of the evidence." *In re M.D.R.*, 11th Dist. Portage Nos. 2018-P-0032 and 2018-P-0033, 2019-Ohio-1054, ¶ 16; *see also In re G.W.*, 8th Dist. Cuyahoga No. 103706, 2016-Ohio-5242, ¶ 15. "Preponderance of the evidence means 'evidence that's more probable, more persuasive, or of greater probative value.'" *In re J.B.*, 8th Dist. Cuyahoga No. 103521, 2016-Ohio-5513, ¶ 54, quoting *In re C.V.M.*, 8th Dist.

Cuyahoga No. 98340, 2012-Ohio-5514, ¶ 17. We review the record to determine if the trial court's judgment is supported by the manifest weight of the evidence. *In re D.G.B.*, 8th Dist. Cuyahoga No. 107921, 2019-Ohio-3571, ¶ 25.

{¶ 43} We will not reverse an award of legal custody absent an abuse of discretion. *In re C.D.Y.*, 8th Dist. Cuyahoga No. 108355, 2019-Ohio-4262, ¶ 8. When applying the abuse of discretion standard, a reviewing court may not substitute its judgment for that of the trial court. *Vannucci v. Schneider*, 2018-Ohio-1294, 110 N.E.3d 716, ¶ 22 (8th Dist.). However, where the court's decision on the child's best interests is not supported by competent, credible evidence, then it is unreasonable and may be reversed. *In re J.W.*, 8th Dist. Cuyahoga No. 108139, 2019-Ohio-3666, ¶ 17, citing *In re Nice*, 141 Ohio App.3d 445, 455, 751 N.E.2d 552 (7th Dist.2001), and *Bechtol v. Bechtol*, 49 Ohio St.3d 21, 550 N.E.2d 178 (1990), syllabus.

### C. Mother's Arguments

{¶ 44} In this case, mother argues that the juvenile court abused its discretion when it granted permanent custody to the agency and denied her motion for legal custody to maternal aunt. However, under *In re Z.C.*, Slip Opinion No. 2023-Ohio-4703, abuse of discretion is not the proper standard in permanent custody cases. It is the proper standard though when determining whether the trial court erred when it denied mother's motion for legal custody to maternal aunt.

{¶ 45} Regarding mother's remaining arguments, she does not frame any of them as challenging the sufficiency and manifest weight of the evidence. Thus, we

will apply the proper standard of review where necessary, depending on mother's specific argument.

### III. Kinship Caregiver Law

{¶ 46} In her first assignment of error, mother argues that the "juvenile court abused its discretion and erred" when it granted permanent custody to the agency and denied mother's motion requesting legal custody to maternal aunt because the court failed to comply with the Kinship Caregiver Law.

{¶ 47} We note at the outset that mother did not raise the Kinship Caregiver Law to the juvenile court. She has therefore forfeited all but plain error. *In re De.D.*, 8th Dist. Cuyahoga No. 108760, 2020-Ohio-906, ¶ 13 ("It is well-established that failure to object to an issue in the lower court waives a party's right to challenge that issue on appeal absent plain error."). "Plain error exists only when it can be determined that the outcome of the trial would have been different." *In re S.F.*, 8th Dist. Cuyahoga No. 112327, 2023-Ohio-1900, ¶ 15, citing *In re Z.T.*, 8th Dist. Cuyahoga No. 88009, 2007-Ohio-827, ¶ 19.

{¶ 48} The Kinship Caregiver Law, set forth in R.C. 2151.4115 through 2151.4122, became effective on September 30, 2021. *See* 2021 Am.Sub.H.B. No. 110. The law requires a public children services agency, such as CCDCFS, to "make intensive efforts to identify and engage an appropriate and willing kinship caregiver for the care of a child who is in [the] [t]emporary custody of the agency." R.C. 2151.4116(A). A "kinship caregiver" includes individuals related to the child by blood or adoption, such as grandparents or siblings, as well as stepparents and

stepsiblings, legal custodians or guardians, and "[a]ny nonrelative adult that has a familiar and long-standing relationship or bond with the child or the family, which relationship or bond will ensure the child's social ties." R.C. 2151.4115(A)(1) (adopting the definition of "kinship caregiver" in R.C. 5101.85 for application to R.C. 2151.4116 through 2151.4122).

{¶ 49} This law requires the juvenile court to determine at every court hearing "whether the public children services agency * * * has continued intensive efforts to identify and engage appropriate and willing caregivers for the child." R.C. 2151.4117(A). However, under R.C. 2151.4118, the court may issue an order that the continuation of the child's placement in the home of a non-kinship caregiver is in the best interest of the child and that continued intensive efforts are unnecessary based on findings set forth in R.C. 2151.4119. Before the court issues an order under R.C. 2151.4118, it must make the following findings:

> (A) The child has been living in a stable home environment with the child's current caregivers for the past twelve consecutive months.
>
> (B) The current caregivers have expressed interest in providing permanency for the child.
>
> (C) The removal of the child from the current caregivers would be detrimental to the child's emotional well-being.

R.C. 2151.4119(A)-(C). "These findings recognize that the time a child spends in the care of foster parents can affect a child's best interest regarding her placement while in [a public children services agency's] temporary custody." *In re L.R.-L.*, 2023-Ohio-2071, 218 N.E.3d 284, ¶ 18 (10th Dist.).

{¶ 50} R.C. 2151.4116 requires public children service agencies to "make intensive efforts to *identify and engage* an appropriate and willing kinship caregiver" when a child is in its temporary custody. The purpose of this law is to compel agencies to exercise intensive efforts to place children who are in the agencies' temporary custody in kinship care rather than in foster care. *In re L.R.-L.* at ¶ 18, citing R.C. 2151.4116.

{¶ 51} Mother points out that the Kinship Caregiver Law "went into effect nearly two years prior to the permanent custody hearing" and that by the time the act went into effect, maternal aunt had already reached out to the agency and had "gotten the run around." Mother claims that "for the majority of the case, the [a]gency was well aware the [a]unt was a willing kinship placement for the [c]hild." Mother further maintains that the agency failed to exercise intensive efforts to place the child with her aunt rather than in foster care.

{¶ 52} Mother's claims, however, are not established by the record in this case. Despite the fact that maternal aunt testified that she "got the run around" when she reached out to the agency when the children went into the agency's temporary custody, the family's case plan filed in January 2020 reflects otherwise. The social worker noted in the case plan that she attempted to find suitable relatives to place the children, but no relatives were available.

{¶ 53} Moreover, the agency's semiannual reports reflect that the social worker continued to search for relatives. In the first semiannual report filed in May 2020, the notes indicate that the social worker investigated a paternal grandmother

and paternal aunt for the children (the children did not have the same father and the notes are not clear which children these relatives were kin to) but they were denied due to various concerns. The notes further state that the agency continued to look for relative placement for the children. But more importantly, the notes indicate that mother "declined wanting the children placed with any of her relatives."

{¶ 54} In the second semiannual report filed in late October 2020, the notes state that "mother does not want any relatives to have the children." The notes further state that the agency had completed kinship caregiver and Accurint searches.[6]

{¶ 55} In the third semiannual report filed in May 2021, the notes state that one relative was available for placement but that relative decided against it due to a conflict with mother.

{¶ 56} In the fourth semiannual report filed in November 2021, the notes state that a maternal cousin was identified as a possible placement for the children. However, the cousin was unemployed and did not have suitable housing. Maternal aunt is mentioned in this semiannual report. The notes state that the social worker contacted the aunt twice to provide her information about the children and their needs, but the aunt did not follow through. The notes conclude that the agency will continue to investigate relatives for placement.

---

[6] LexisNexis Accurint® is a direct connection to public records to help verify identities, conduct investigations, and detect fraud. *See* https://www.accurint.com (accessed Mar. 8, 2024).

{¶ 57} By the time the fifth semiannual report was filed in May 2022, mother had filed her motion that month for legal custody to maternal aunt. At that point, the agency began the process of conducting the ICPC to determine if the aunt was an appropriate caregiver to place the child.

{¶ 58} Therefore, we find that the record establishes that the agency went to great lengths to find relatives who would — and could — care for the child during the pendency of the case. Due in part to mother's own actions — and maternal aunt's for that matter — the agency could not find able and willing relatives until well after the child had been in the agency's temporary custody. Indeed, when mother filed her motion for legal custody to maternal aunt, the child had been in the agency's temporary custody for two-and-a-half years and after she had been in the same foster home for nearly one-and-a-half years.

{¶ 59} Mother further argues that the juvenile court held multiple hearings in this case after the Kinship Caregiver Law went into effect and it failed to comply with the requirements of R.C. 2151.4117 through 2151.4119. Specifically, mother contends that the court failed to make the required finding at the hearing that "the public children services agency * * * has continued intensive efforts to identify and engage appropriate and willing kinship caregivers for the child." R.C. 2151.4117(A). Mother also asserts that the court failed to make the findings under R.C. 2151.4119(A)-(C), which would have relieved the agency from its obligation to exercise intensive efforts. R.C. 2151.4118.

{¶ 60} While mother is correct that due to the length of this case, the juvenile court held multiple hearings after the Kinship Caregiver Law went into effect and that the court did not make the required findings under R.C. 2151.4117 through 2151.4119, we find no reversible error. The child had been in the temporary custody of CCDCFS since December 2019, nearly two years before the Kinship Caregiver Law became effective on September 30, 2021. And at that point, the child had already been in three different foster homes. Thankfully, the third foster home, where the child had been for nearly one year when the Kinship Caregiver Law became effective, provided the child with the essential stability and care that she needed.

{¶ 61} By the time of the permanent custody hearing, the child had been living with her foster mother for approximately two-and-a-half years. The child was doing very well at her placement despite having significant behavioral issues for a long time after the agency received temporary custody of her. The child was bonded with her foster mother, and her foster mother was interested in adopting the child. And both the guardian ad litem and the social worker expressed their concerns that removing the child from her current placement would not be in her best interest and could have been detrimental to her. Thus, the trial court could have made the findings under R.C. 2151.4119(A)-(C) to relieve CCDCFS from its R.C. 2151.4116 statutory obligation. We therefore conclude that any error in not making the findings is harmless error.

{¶ 62} Moreover, as the Tenth District pointed out in *In re L.R.-L.*, 2023-Ohio-2071, 218 N.E.3d 284:

Once a child enters the permanent custody of a public children services agency, the question of whether the child should reside in foster care or with a kinship caregiver while the child is in the agency's temporary custody becomes moot. Consequently, the trial court's ruling granting [the agency's] motion for permanent custody rendered the question of who would care for [the child] while she was in [the agency's] temporary custody moot. The trial court, therefore, did not err by failing to issue an order relieving [the agency] of the duty to exercise intensive efforts to identify and engage an appropriate and willing kinship caregiver.

*Id.* at ¶ 20.

{¶ 63} Accordingly, we overrule mother's first assignment of error.

## IV. Permanent Custody

{¶ 64} In her second assignment of error, mother argues that "[t]he juvenile court abused its discretion and erred in denying [her] motion for legal custody to the [a]unt because an award of legal custody to the [a]unt is supported by a preponderance of the evidence." In her third assignment of error, mother argues that the trial court erred in granting permanent custody to the agency because the trial court's judgment is not supported by clear and convincing evidence. We will address these arguments together because they are interrelated and because the disposition of one will ultimately resolve the other. Because the standard for permanent custody is the more stringent standard, we will address it first.

### A. Two-Prong Analysis for Permanent Custody

{¶ 65} R.C. 2151.414 sets forth a two-prong analysis to be applied by a juvenile court in adjudicating a motion for permanent custody. Under the statute, the juvenile court is authorized to grant permanent custody of a child to the agency

if, after a hearing, the court determines, by clear and convincing evidence, that (1) any of the five factors under R.C. 2151.414(B)(1)(a) to (e) exists and (2) permanent custody is in the best interest of the child under the factors enumerated in R.C. 2151.414(D)(1).

{¶ 66} Under the first prong, a court must find by clear and convincing evidence one of the following five factors:

(a) * * * [T]he child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents [in making this determination, the juvenile court must consider the factors set forth in R.C. 2151.414(E)].

(b) The child is abandoned.

(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period[.]

(e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

R.C. 2151.414(B)(1)(a)-(e).

{¶ 67} If any of these five factors under R.C. 2151.414(B)(1) exists, the trial court proceeds to analyze the second prong, where it must determine, also by clear and convincing evidence, that granting permanent custody of the child to the agency is in the best interest of the child. R.C. 2151.414(D)(1) sets forth five factors that the court must consider when making the best-interest determination, including:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child * * *;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) apply in relation to the parents and child.

R.C. 2151.414(D)(1).

{¶ 68} It is axiomatic that the best interest determination focuses on the child, not the parent. *In re Mayle*, 8th Dist. Cuyahoga Nos. 76739 and 77165, 2000 Ohio App. LEXIS 3379, 17-18 (July 27, 2000), citing *Miller v. Miller*, 37 Ohio St.3d 71, 75, 523 N.E.2d 846 (1988). Indeed, R.C. 2151.414(C) expressly prohibits the court from considering the effect the granting of permanent custody to a children services agency would have upon the parents.

**1. First Prong**

{¶ 69} Mother did not challenge the first prong at the permanent custody hearing, nor does she raise any issues with this prong on appeal. The child had been in the temporary custody of CCDCFS for nearly three-and-a-half years at the time of the permanent custody hearing, and thus, R.C. 2151.414(B)(1)(d) applies. We further note that the juvenile court also found that the agency proved by clear and

convincing evidence that several factors under R.C. 2151.414(E) apply, which we agree and mother does not challenge, and therefore, R.C. 2151.414(B)(1)(a) would also be applicable under the first prong.

## 2. Second Prong — Best Interest Factors

{¶ 70} The juvenile court found that the agency proved by clear and convincing evidence that it was in the child's best interest to award permanent custody to the agency. Mother argues that the first four best interest factors support granting legal custody to maternal aunt. We will discuss each of the best interest factors.

### a. Child's Relationships

{¶ 71} The juvenile court found that "legal custody or placement with maternal aunt would not be in the child's best interest," explaining:

> [T]he maternal aunt has not demonstrated a commitment toward the child by regular supporting, visiting, or communicating with the child when able to do so[.] The child has been placed with the current foster parent and family for nearly three years and shown marked improvement with the support of the foster parent and ongoing supervised contact with the mother and her siblings.

{¶ 72} Mother argues that the first best interest factor weighs in favor of legal custody to maternal aunt. Mother maintains that the child has a "long-standing loving familial relationship" with her aunt. She states that prior to the child's removal from mother, the aunt visited them from Chicago several times a year. Mother further argues that the juvenile court's finding that maternal aunt "'has not demonstrated a commitment toward the child by regularly supporting, visiting, or

communicating with the [c]hild when able to do so'" was "wholly unsupported by the evidence."

{¶ 73} We disagree with mother that the juvenile court's finding was unsupported by the evidence. While the aunt had a relationship with the child before she was removed from mother, the child was seven years old at the time of removal. The aunt had no contact with the child between December 2019 and January 2023. Even the aunt agreed that when she visited the child, they had to "rekindle" their relationship because the child was shy around the aunt. Maternal aunt claims that she got the run around when she tried to contact CCDFCS when the child first went into care, but as we already stated, the record belies that claim.

{¶ 74} Moreover, maternal aunt admitted on cross-examination that she was aware that the agency and the guardian ad litem wanted her to establish a relationship with the child before they would agree to uproot her and move her to Chicago. The aunt also admitted that she was aware that the juvenile court wanted to see the same because it stated in its October 2022 judgment that "preplacement visits" with the aunt needed to take place before it would consider legal custody to the aunt. Despite knowing that she needed to visit her niece, maternal aunt did not do so until late January 2023.

{¶ 75} Additionally, maternal aunt did not attempt to communicate with the child between the September 2022 court hearing and her the first visit in late January 2023. Nor did the aunt attempt to communicate with the child after the first visit and when she saw her again in March 2023. Likewise, the aunt did not

communicate with the child between the second visit in March and third visit, which took place the day before the permanent custody hearing in June 2023. When asked why she did not call her niece between visits, maternal aunt stated that she had been busy. She also stated that the child was busy and she was unaware of the child's schedule. She did not explain why she did not take the time to know the child's schedule.

{¶ 76} Mother argues that the social worker never told maternal aunt that she could communicate with the child, but again, the record does not support mother's claim. The social worker stated that she gave maternal aunt her work cell phone number and her desk number as well as the foster mother's cell phone number. The social worker further testified that she did not place any restrictions on the aunt's visits except to notify the agency two weeks before she visited so the agency could arrange to transport the child from Canton to Cleveland.

{¶ 77} To the extent that maternal aunt's testimony conflicts with the social worker's testimony, we will defer to the trier of fact.

### b. Child's Wishes

{¶ 78} The juvenile court explicitly stated that it considered the child's wishes. And then it still found that it was in the child's best interest for the agency to have permanent custody of her.

{¶ 79} The child's attorney and the guardian ad litem both stated that at the time of trial, the child wished to live with her aunt. The social worker also testified that a few weeks before trial, the child wanted to live with her aunt. But the social

worker also testified that the child had expressed that she wanted to remain with her foster mother. The social worker stated that the child's wishes changed monthly, depending on who was buying her gifts.

{¶ 80} Mother argues that the child's wish to be with maternal aunt weighs in favor of legal custody to maternal aunt. Even if we accept this as true, the trial court still had to weigh that factor against all the other best interest factors. And under the statute, no single factor is given greater weight than the others. *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 56.

### c. Custodial History

{¶ 81} Mother claims that the custodial history of the child weighs in favor of legal custody to maternal aunt. Mother argues that because the aunt had known the child her whole life, the agency should have placed the child with the aunt in January 2023, when the ICPC assessment was completed and the aunt's home was deemed appropriate. We disagree.

{¶ 82} The juvenile court considered that the child had been in the agency's temporary custody for more than two years. In fact, the child had been in the agency's temporary custody for nearly three-and-one-half years. By law, the maximum amount of time the agency can have temporary custody of a child is one year. R.C. 2151.353(G). The law permits the agency to file for two six-month extensions of temporary custody, for a total of two years. R.C. 2151.415(D)(4).[7] We

---

[7] However, "the passing of the statutory time period ('sunset date') pursuant to R.C. 2151.353(F) does not divest juvenile courts of jurisdiction to enter dispositional orders." *In re Young Children*, 76 Ohio St.3d 632, 669 N.E.2d 1140 (1996), syllabus.

note that for a large portion of the first two years, mother was either missing from authorities or in prison. Mother essentially did not see the child from December 2019 until September 2023.

{¶ 83} Further, even maternal aunt admitted that although she loved her niece, she had not seen her since before she was removed from mother's care. Maternal aunt stated that the child was "shy" around her when they saw each other and she had to "rekindle" their relationship. The juvenile court had to consider the fact that the child had made significant progress in the foster mother's home and uprooting her could be detrimental to that progress. The fact that the child had been in the agency's temporary custody for so long does not weigh in favor of legal custody to maternal aunt — especially when maternal aunt did not establish that she was fully committed to taking custody of the child.

### d. Legally Secure Placement

{¶ 84} Mother also argues that maternal aunt was willing and able to give the child a legally secure placement. She maintains that any lack of contact between maternal aunt and the child was solely the agency's fault because the agency controlled the child's situation. We disagree.

---

Moreover, "because the court retains jurisdiction over the child, it may make further dispositional orders as it deems necessary to protect the child" and where "the problems that led to the original grant of temporary custody have not been resolved or sufficiently mitigated, courts have the discretion to make a dispositional order in the best interests of the child." *Id*. at 638. *See also In re A.S.*, 8th Dist. Cuyahoga No. 109292, 2020-Ohio-5186, ¶ 12-13.

{¶ 85} The social worker testified that she did not put any limitations on the aunt visiting or communicating with the child. She simply told the aunt to notify her two weeks in advance so that she could arrange for transportation of the child from Canton to Cleveland. The social worker also gave the aunt her cell phone number, desk number, and the foster mother's cell number. And still, the aunt did not call the child and only visited her three times from September 2022 until June 2023. Even assuming for the sake of argument that the aunt did not know that she could visit or call the child until December 2022, which is what the aunt stated at the permanent custody hearing, that does not explain why she did not call the child regularly between that time when she knew she could call and the permanent custody hearing. The aunt admitted that she was aware that the social worker, court, and guardian ad litem wanted her to establish a relationship with the child. The aunt also could not explain why she did not call the child in between the three short visits she had with the child except to say that she was busy getting her home ready for the child.

{¶ 86} The juvenile court found that the aunt had not demonstrated a commitment to the child by regularly supporting, visiting, or communicating with the child when able to do so. Based upon the record before us, the juvenile court's finding was supported by clear and convincing evidence.

### e. R.C. 2151.414(E)(7)-(11) Factors

{¶ 87} Mother does not mention this best interest factor, but it also applies here. The juvenile court found that under R.C. 2151.414(E)(11), mother had her

parental rights terminated with respect to a sibling of the child and that she "failed to provide clear and convincing evidence to prove, that notwithstanding the prior termination, [she] can provide a legally secure permanent placement and adequate care for the health, welfare and safety of the child." This finding is also supported by clear and convincing evidence. The juvenile court granted the agency permanent custody of mother's other three children in October 2022.

### f. Best Interest Summary

{¶ 88} After considering each of the best-interest factors and mother's arguments, we conclude that the trial court's judgment finding that the agency presented clear and convincing evidence establishing that it was in the child's best interest to be placed in the permanent custody of CCDCFS is supported by sufficient evidence and is not against the manifest weight of the evidence. Although mother argues that four of the five factors support granting legal custody of the child to maternal aunt, it is our view that only one of the factors did so — the child's wishes.

{¶ 89} As we previously stated, "[t]here is not one [best interest factor] that is given greater weight than the others pursuant to the statute." *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, at ¶ 56. In this case, four of the five factors supported granting permanent custody to the agency.

### 3. Conclusion

{¶ 90} We conclude that the agency presented clear and convincing evidence to establish both prongs of the permanent custody statute. Therefore, the trial court did not err when it granted permanent custody to the agency and denied mother's

motion for legal custody to maternal aunt. We further conclude that the juvenile court's decision is supported by sufficient evidence and is not against the manifest weight of the evidence. Accordingly, we overrule mother's second and third assignments of error.

## V. Constitutional Argument

{¶ 91} In her fourth (and supplemental) assignment of error, mother argues the juvenile court's judgment and R.C. Chapter 2151 were unconstitutional as applied to her because maternal aunt was willing to accept legal custody of the child and keep her in the family. Mother's constitutional claim is not clear; however, she appears to argue that her substantive due process rights were violated when the juvenile court ordered that the child be placed in the permanent custody of CCDFS instead of awarding maternal aunt legal custody.

{¶ 92} Mother did not raise a constitutional argument to the juvenile court. An appellate court is not required to address constitutional challenges that were not raised before the trial court. *In re K.*, 8th Dist. Cuyahoga No. 83410, 2004-Ohio-4629, ¶ 13, citing *State v. Childs*, 14 Ohio St.2d 56, 236 N.E.2d 545 (1968), paragraph three of the syllabus; *State v. Awan*, 22 Ohio St.3d 120, 489 N.E.2d 277 (1986), syllabus. But given the seriousness of terminating parental rights, we will briefly address her argument.

{¶ 93} "A party may challenge the constitutionality of a statute with either a facial challenge or an as-applied challenge." *Simpkins v. Grace Brethren Church of Del.*, 149 Ohio St.3d 307, 2016-Ohio-8118, 75 N.E.3d 122, ¶ 20. "A facial challenge

asserts that there is no conceivable set of circumstances in which the statute would be valid." *Id.* "An as-applied challenge, on the other hand, alleges that application of the statute in a particular factual context is unconstitutional." *Id.* "A party raising an as-applied constitutional challenge must prove by clear and convincing evidence that the statute is unconstitutional when applied to an existing set of facts." *Id.* at ¶ 22.

{¶ 94} The Due Process Clause is set forth in the Fourteenth Amendment and provides that no state shall "deprive any person of life, liberty, or property, without due process of law." The United States Supreme Court has long recognized that the Due Process Clause "guarantees more than fair process." *Washington v. Glucksberg*, 521 U.S. 702, 719, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997). The Due Process Clause also includes a substantive component that "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Id.* at 720; *see also Reno v. Flores*, 507 U.S. 292, 301-302, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993). However, while a parent does have a fundamental interest in the care, custody, and management of his or her child, those rights are not absolute. *In re Cunningham*, 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979). A parent's natural rights are always subject to the ultimate welfare of the child. *Id.*

{¶ 95} Mother argues that under R.C. 2151.353(A)(3), "a less intrusive and less paternal application of law" was available to the juvenile court because maternal aunt "testified that she would be glad to take the child in and keep the child as a part of the family." R.C. 2151.353(A)(3) states that if a child is adjudicated abused,

neglected, or dependent, the juvenile court, in addition to several other dispositions, may "[a]ward legal custody of the child to either parent or to any other person who, prior to the dispositional hearing, files a motion requesting legal custody of the child or is identified as a proposed legal custodian in a complaint or motion filed prior to the dispositional hearing by any party to the proceedings."

{¶ 96} Mother claims that "it was unconstitutional to apply Ohio law to eliminate that alternative family first approach." Mother contends that under this approach, maternal aunt would have obtained legal custody and mother would have retained her residual parental rights. Mother argues that she could have then sought to gain custody of her child back from maternal aunt if she became fully rehabilitated. In support of her constitutional argument, mother spends most of her supplement brief relying on the same facts regarding maternal aunt that she did in her first three arguments. Considering those facts again for purposes of determining if mother's due process rights were violated, we determine that they were not.

{¶ 97} After review, we do not agree with mother that R.C. Chapter 2151 as applied to her violated her substantive due process rights. Mother was afforded more time and opportunity than most parents to establish that the child should be returned to her. But due to mother's own actions, that was not possible. Moreover, maternal aunt had ample opportunity as well to show the court that she was committed to her niece and she failed to do so. Accordingly, we conclude that mother did not prove by clear and convincing evidence that the permanent custody

provisions were unconstitutional when applied to the facts of her case. *Simpkins*, 149 Ohio St.3d 307, 2016-Ohio-8118, 75 N.E.3d 122, at ¶ 22.

{¶ 98} Mother's fourth (and supplemental) assignment of error is overruled.

{¶ 99} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MICHELLE J. SHEEHAN, PRESIDING JUDGE

MARY EILEEN KILBANE, J., and
MICHAEL JOHN RYAN, J., CONCUR