[Cite as *In re K.C.*, 2025-Ohio-5047.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| IN RE K.C. | : | |
| | | No. 114958 |
| A Minor Child | : | |
| | | |
| [Appeal by M.C., Mother] | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED IN PART, REVERSED IN PART,
  AND REMANDED
**RELEASED AND JOURNALIZED:** November 6, 2025

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD22908302

### *Appearances:*

Dawn Snyder, Attorney at Law, LLC and Dawn Snyder, *for appellant*.

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Joseph C. Young, Assistant Prosecuting Attorney, *for appellee* CCDCFS.

Fanger & Davidson LLC, Jeffrey J. Fanger, and Gerry Davidson, *for appellees* A.A. and I.A.

DEENA R. CALABRESE, J.:

{¶ 1} Appellant M.C. ("Mother") appeals the juvenile court's order granting legal custody to foster parents A.A. and I.A. ("foster parents"). For the reasons

stated below, we affirm in part, reverse in part, and remand the case to the juvenile court.

## I. Relevant Facts and Procedural History

{¶ 2} On August 17, 2022, K.C. (d.o.b. 8/14/22) was placed in the predispostional temporary custody of CCDCFS because of concerns of Mother's mental-health, substance-use, and anger-management problems. At the time of K.C.'s birth, Mother was a minor and was in the temporary custody of CCDCFS. (Aug. 17, 2022 complaint.) K.C. was placed with foster parents when he was three days old, and K.C. has remained with foster parents to the present day.

{¶ 3} On October 27, 2022, the juvenile court adjudicated K.C. to be dependent. On November 1, 2022, the juvenile court committed K.C. to the temporary custody of CCDCFS.

{¶ 4} On June 20, 2023, K.C.'s maternal great grandmother ("L.B.") filed a motion to intervene and a motion for legal custody of K.C. On July 10, 2023, CCDCFS filed a motion to modify temporary custody to permanent custody. On November 8, 2023, Mother filed a motion for legal custody of K.C. to L.B. The juvenile court held a hearing, and on February 23, 2024, denied CCDCFS's motion to modify temporary custody to permanent custody and extended temporary custody. The February 23, 2024 order does not address Mother's motion for legal custody of K.C. to L.B. It appears from the record that the juvenile court later entered a denial of Mother's motion without a journal entry.

{¶ 5} On July 5, 2024, CCDCFS filed a second motion to modify temporary custody to permanent custody. On August 22, 2024, foster parents filed a motion to intervene and a motion to establish kinship relationship. On September 12, 2024, foster parents opposed CCDCFS's motion for permanent custody and filed a motion for legal custody. On October 23, 2024, CCDCFS amended their motion for permanent custody to a motion for legal custody to foster parents. On October 25, 2024, Mother filed a renewed motion for legal custody to L.B. and added maternal great uncle, J.B. ("J.B."), as a proposed additional custodian.

{¶ 6} On February 28, 2025, the juvenile court held a hearing on the various pending motions regarding custody of K.C. The following testimony was established.

**A. Melanie Green**

{¶ 7} Melanie Green ("Green") testified that she is employed as an ongoing worker in the START department at CCDCFS. She was assigned to work with K.C. in May 2023. Mother failed to comply with drug screens and other objectives in her case plan. Mother attended monthly supervised visits with K.C. The alleged father has neither established paternity nor participated in this case.

{¶ 8} K.C. was placed with foster parents when he was three days old. At the time of his placement, there was no known relative available for placement. K.C. is bonded with foster parents and with the other children in the home. Foster parents had been consistently meeting K.C.'s needs his entire life.

{¶ 9} L.B. came forward several months into the case and expressed her interest in having K.C. placed with her. Green testified that the agency considered L.B. and maternal great uncle J.B. for placement of K.C. J.B. passed a background check when L.B. was initially presented as a potential placement for K.C., but he was not presented as a potential caregiver until October 2024 when Mother renewed her motion for legal custody. Green stated that L.B.'s home was safe and was a "nice" house. CCDCFS began visits with K.C. and L.B. L.B.'s overnight visits were terminated because of concerns of unsafe sleep practices, difficulties with her mobility, and inconsistency in her visits with K.C.

{¶ 10} Green has ongoing concerns about L.B.'s ability to care for K.C. L.B.'s physical limitations make it difficult for her to pick K.C. up. L.B. also admitted to cosleeping on the couch with K.C. during overnight visits because she struggled with getting him into and out of the portable crib. J.B. expressed that he was willing and able to assist L.B. in caring for K.C., but Green had concerns that he was largely absent from the home because of his work schedule. L.B. did not attend any of K.C.'s medical appointments, even after they were rescheduled to accommodate L.B.'s schedule.

{¶ 11} Green also had concerns that L.B.'s work schedule would impede her ability to care for K.C. L.B. did not attend any of K.C.'s medical appointments, stating they conflicted with her work schedule. At some point during the case, L.B. stated that she retired and would be available to care for K.C., however, she would

not or could not produce any documentation showing that she was retired. (Feb. 4, 2025 tr. 21-75.)

**B. A.A.**

{¶ 12} A.A. testified that K.C. has established a bond with herself and the other members of the family.

{¶ 13} A.A. also testified about her interactions with L.B. She stated that L.B. did not elect to exercise all of the visitation time available to her. A.A. also testified that J.B. did not attend all of the visits and had "maybe four visits max" with K.C. A.A. did not believe L.B. was physically capable of caring for K.C. because L.B. was not able to carry him up the steps when he was in a car seat.

{¶ 14} A.A. also testified about her conversations with Mother regarding custody of K.C. She stated that Mother said that she hoped the foster parents would be granted custody of K.C. Mother also stated, about L.B., "I don't want her to have — she wants him for the money." (Feb. 4, 2025 tr. 89-139.)

**C. I.A.**

{¶ 15} I.A. testified about his interactions with L.B. During one visit, L.B. refused to place K.C. in his car seat and buckle him in when I.A. went to get him. Another time, L.B. was not able to carry K.C.'s car seat during a visit. (Feb. 4, 2025 tr. 141-152.)

**D. L.B.**

{¶ 16} L.B. testified that she is Mother's paternal grandmother. She retired in October 2024 after working for 43 years as a state-tested nursing assistant.

{¶ 17} L.B. learned of K.C.'s birth when he was two or three months old. She denied that she coslept with K.C. She also stated that K.C.'s car seat was too big for her to carry so she purchased a lighter car seat that she was able to manage. L.B. admitted that she has never attended any of K.C.'s medical appointments. She stated she could not get time off from work. (Feb. 4, 2025 tr. 154-225.)

**E. J.B.**

{¶ 18} J.B. testified that he is K.C.'s maternal great uncle and L.B.'s son. He lives with L.B. and is employed as a sous chef. He attended some visits with K.C. and felt they had bonded. J.B. stated he would assist L.B. in raising K.C. (Feb. 4, 2025 tr. 227-244.)

**F. Guardian Ad Litem**

{¶ 19} K.C.'s guardian ad litem recommended that legal custody of K.C. to his foster parents was in his best interests. She also stated as follows:

> I do believe that legal custody would be a beautiful outcome in this case. [K.C.] is well bonded with his foster family. They've taken care of him since birth. But mom and her family have expressed interest along the way, but mom is very young. . . . we extended this case longer than we typically do. And out of all fairness and out of the best, you know, towards the best interest of [K.C.], we gave everybody every opportunity. ... [K.C.'s] always been happy there [A.A. and I.A.'s Home]. . . . He does have siblings there. . . . I think that this is an ideal situation for him.

(Feb. 28, 2025 tr. 246-248.)

{¶ 20} On March 3, 2025, the juvenile court found the following, in relevant part:

> The Court finds, pursuant to O.R.C. 2151.4119, all of the following: (A) The child has been living in a stable home environment with the child's

current caregivers for the past twelve consecutive months. (B) The current caregivers have expressed interest in providing permanency for the child. (C) The removal of the child from the current caregivers would be detrimental to the child's emotional well-being.

Therefore, the Court and CCDCFS may consider the child's current caregiver as having a kin relationship with the child and at an equal standing to other kin in regard to permanency.

It is further ordered that the child is committed to the Legal Custody of [the foster parents].

IT IS ORDERED, ADJUDGED, AND DECREED that the Order heretofore made committing the child to the Temporary Custody of the Cuyahoga County Division of Children and Family Services is hereby terminated.

The Court further finds that the child's continued residence in or return to the home of Mother, [M.C.] will be contrary to the child's best interest.

{¶ 21} Mother raises a single assignment of error:

The trial court erred when it awarded legal custody to foster parents.

## II. Law and Analysis

{¶ 22} In her sole assignment of error mother argues that the juvenile court erred when it awarded legal custody of K.C. to the foster parents and when it determined that the foster parents are "kin" pursuant to the Kinship Caregiver Act.

{¶ 23} Pursuant to R.C. 2151.353(A)(3), a juvenile court may award legal custody of a child who has been adjudicated abused, neglected, or dependent to either parent or to any person who files a motion seeking legal custody prior to the dispositional hearing. "Legal custody" is

a legal status that vests in the custodian the right to have physical care and control of the child and to determine where and with whom the child shall live, and the right and duty to protect, train, and discipline

the child and to provide the child with food, shelter, education, and medical care, all subject to any residual parental rights, privileges, and responsibilities.

R.C. 2151.011(B)(21).

{¶ 24} A trial court's "authority to award legal custody . . . is limited only by the best interests of the child." *In re W.A.J.*, 2014-Ohio-604, ¶ 3 (8th Dist.). When determining whether to grant legal custody of a child to a nonparent the juvenile court must find, by a preponderance of the evidence, that legal custody is in the best interests of the child. *In re T.A.*, 2024-Ohio-5139, ¶ 41 (6th Dist.), citing *In re Am.H.*, 2019-Ohio-4374, ¶ 36 (6th Dist.), citing *In re Christopher M.*, 2007-Ohio-1040, ¶ 12 (6th Dist.); *In re A.B.*, 2020-Ohio-3990, ¶ 15 (6th Dist.). The best interest of the child is "of paramount concern" when making custody determinations. *In re M.J.M.*, 2010-Ohio-1674, ¶ 14 (8th Dist.), citing *In re A.W.-G.*, 2004-Ohio-2298, ¶ 6 (12th Dist.). "In making such a determination 'courts have looked to the best interest factors of R.C. 2151.414(D), R.C. 3109.04(F)(1), a combination of the two, or general notions of what should be considered regarding the best interests of the [child].'" *In re A.D.*, 2017-Ohio-6913, ¶ 32 (6th Dist.), quoting *In re A.K.*, 2012-Ohio-4430, ¶ 25 (9th Dist.).

{¶ 25} In this case, the juvenile court did not make a best-interest finding with regard to foster parents or L.B. and J.B. The juvenile court determined that returning K.C. to Mother was not in his best interest. However, at the time of the hearing, there were competing pending legal-custody motions. Two of the pending motions were for legal custody to foster parents and there was also a pending motion

for legal custody to L.B. and J.B. The juvenile court's order did not make a best-interest finding with regard to foster parents or L.B. and J.B. before ultimately awarding legal custody to foster parents, and effectively denying the motion for legal custody to L.B. and J.B. As the *In re M.J.M.* Court found, the best interest of the child is "of paramount concern" when making custody determinations. Specifically, for a determination of why legal custody to foster parents rather than L.B. is in the best interests of K.C. Therefore, the juvenile court erred when it failed to make a best-interest finding as to the proposed legal custodians, here foster parents, L.B., and J.B.

{¶ 26} Mother also argues that the trial court erred when it determined that foster parents are "kin" pursuant to R.C. 2151.4119 and entitled to equal standing of other kin. Although Mother asserts in her sole assignment of error that the Kinship Caregiver Act was not followed, adherence to the statute is separate and distinct from determination of legal custody. The Kinship Caregiver Act does not apply to the merits of foster parents', or Mother's, motions for legal custody. It applied to K.C.'s placement while in the temporary custody of CCDCFS. *In re A.S.S.S.*, 2025-Ohio-2621, ¶ 34 (9th Dist.).

{¶ 27} The Kinship Caregiver Act, set forth in R.C. 2151.4115 through 2151.4122, became effective on September 30, 2021. It requires a children services agency, such as CCDCFS, to "make intensive efforts to identify and engage an appropriate and willing kinship caregiver for the care of a child" who is in the temporary custody of CCDCFS. R.C. 2151.4116.

{¶ 28} Pursuant to R.C. 2151.4115, a "kinship caregiver" has the same meaning as defined in R.C. 5101.85.[1] That definition is as follows:

> "[K]inship caregiver" means any of the following who is eighteen years of age or older and is caring for a child in place of the child's parents:
>
> (A) The following individuals related by blood or adoption to the child:
>
> (1) Grandparents, including grandparents with the prefix "great," "great-great," or "great-great-great";
>
> (2) Siblings;
>
> (3) Aunts, uncles, nephews, and nieces, including such relatives with the prefix "great," "great-great," "grand," or "great-grand";
>
> (4) First cousins and first cousins once removed.
>
> (B) Stepparents and stepsiblings of the child;
>
> (C) Spouses and former spouses of individuals named in divisions (A) and (B) of this section;
>
> (D) A legal guardian of the child;
>
> (E) A legal custodian of the child;
>
> (F) *Any nonrelative adult that has a familiar and long-standing relationship or bond with the child or the family, which relationship or bond will ensure the child's social ties.*

(Emphasis added.) R.C. 5101.85.

{¶ 29} The Kinship Caregiver Act requires the juvenile court to determine at every hearing whether CCDCFS "has satisfied its duty to use intensive efforts to identify and engage an appropriate and willing kinship caregiver." *In re L.R.-L.*, 2023-Ohio-2071, ¶ 12 (10th Dist.), citing R.C. 2151.4417. However, pursuant to R.C.

---

[1] Beginning September 30, 2025, R.C. 5101.85 was renumbered as R.C. 5180.50.

2151.4118, the juvenile court can make a finding that "the continuation of the child's current placement is in the child's best interest and that intensive efforts to identify and engage an appropriate and willing kinship caregiver for the child are unnecessary if the court makes the findings in section 2151.4119 of the Revised Code."

{¶ 30} The R.C. 2151.4119 findings are as follows:

A court may issue an order under section 2151.4118 of the Revised Code if it finds all of the following:

(A) The child has been living in a stable home environment with the child's current caregivers for the past twelve consecutive months.

(B) The current caregivers have expressed interest in providing permanency for the child.

(C) The removal of the child from the current caregivers would be detrimental to the child's emotional well-being.

{¶ 31} Of significance here,

[i]f the juvenile court makes the R.C. 2151.4118 finding relieving the agency of continued intensive efforts to locate an appropriate kinship caregiver, it is significant that this new statutory scheme allows the juvenile court and agency to "consider the child's current caregiver as having a kin relationship with the child *and at an equal standing to other kin in regards to permanency.*"

(Emphasis in original.) *In re B.D.*, 2022-Ohio-1832, ¶ 38 (9th Dist.), quoting R.C. 2151.4120.

{¶ 32} Mother contends that the trial court erred when it determined that foster parents are "kin" pursuant to R.C. 2151.4119 and entitled to equal standing with other kin. However, Mother does not support her assertion that foster parents

do not meet the statutory requirements for designation as "kinship caregivers" with any supporting legal authority.

{¶ 33} In addition, the crux of Mother's argument is that the juvenile court "misapplied" the Kinship Caregiver Act "because the evidence shows that [CCDCFS] disregarded willing and able family members" by maintaining K.C. in a placement with foster parents rather than with L.B. (Mother's brief at 15.) Mother also argues that CCDCFS did not place K.C. in the least restrictive setting as dictated by Adm.Code 5101:2-42-05. However, Mother did not object to K.C.'s placement with foster parents during the pendency of the case.

{¶ 34} Pursuant to R.C. 2151.412(F)(2), "[a]ny party may propose a change to a substantive part of the case plan, including, but not limited to, the child's placement and the visitation rights of any party." In addition, pursuant to R.C. 2151.417(A):

> Any court that issues a dispositional order pursuant to section 2151.353, 2151.414, or 2151.415 of the Revised Code may review at any time the child's placement or custody arrangement, the case plan prepared for the child pursuant to section 2151.412 of the Revised Code, the actions of the public children services agency or private child placing agency in implementing that case plan, the child's permanency plan if the child's permanency plan has been approved, and any other aspects of the child's placement or custody arrangement.

{¶ 35} Because Mother's challenge to the juvenile court's kinship caregiver finding revolves around K.C.'s placement with foster parents during the pendency of the case, and Mother never objected to that placement, Mother waived all but plain error. *In re A.M.*, 2024-Ohio-1164, ¶ 47 (8th Dist.), *see also In re G.T.*, 2025-Ohio-1338, ¶ 52 (8th Dist.). "'Plain error exists only when it can be determined that

the outcome of the trial would have been different.'" *In re A.M.* at *id.*, quoting *In re S.F.*, 2023-Ohio-1900, ¶ 15 (8th Dist.), citing *In re Z.T.*, 2007-Ohio-827, ¶ 19 (8th Dist.). We find no merit to Mother's argument that the juvenile court erred when it made a finding that foster parents are "kin" pursuant to R.C. 2151.4119.

{¶ 36} For the reasons stated above, we sustain in part and overrule in part Mother's assignment of error. We reverse the juvenile court's award of legal custody to foster parents and remand for the juvenile court to make best-interest findings regarding the proposed legal custodians. We affirm the juvenile court's finding that the foster parents are "kin."

It is ordered that appellant and appellee split the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
DEENA R. CALABRESE, JUDGE

EILEEN T. GALLAGHER, P.J., and
EMANUELLA D. GROVES, J., CONCUR