**[Cite as *In re J.K-S.*, 2024-Ohio-2053.]**

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

In re J.K.-S., Jo.S.

Court of Appeals No.  L-23-1201

Trial Court No.  AB022287872

<u>**DECISION AND JUDGMENT**</u>

Decided:  May 28, 2024

* * * * *

Rebecca L. West-Estell, Esq., for appellee.

Laurel A. Kendall, for appellant.

* * * * *

**MAYLE, J.**

**{¶ 1}** This case concerns J.K.-S. (D.O.B. 3/7/2018) and Jo.S. (D.O.B. 8/18/2019). The appellant, V.S. ("father") appeals the August 11, 2023 judgment of the Lucas County Court of Common Pleas, Juvenile Division that terminated his parental rights and granted permanent custody of the children to Lucas County Children Services ("LCCS").  For the following reasons, we affirm.

# I. Background

{¶ 2} On February 7, 2022, LCCS received a referral that J.K.-S. had been admitted to Toledo Hospital for a laceration "starting at the child's eyebrow near his nose bone all the way up to his hairline." Father denied witnessing the incident, but his "paramour" reported to hospital staff that "[f]ather was the source of [J.K.-S's] injuries and that [father] holds her hostage in their home." (Feb. 8, 2022 Ex Parte Order)

{¶ 3} While at the hospital, J.K.-S. was observed to have significant bruising, including a "thumbprint-size bruise of a light purple color" behind both ears, a "circular thumbprint size bruise of green coloring" on his middle shoulder blade, a "developing bruise" along his neck, "various bruises of different colors on his bottom * * * [that] nearly covers both cheeks," and a "deep bruise" from J.K.-S.'s groin to hip area. Father blamed his girlfriend's mother for the bruises. (Complaint in ¶ 5). LCCS received a second referral that same day that J.K.-S. was reporting that father caused his "injuries" and that the hospital's trauma team "had concerns" about J.K.-S. returning to father's care.

{¶ 4} Later in the day, still February 7, 2022, J.K.-S.'s younger sister, J.So., was evaluated at the LCCS clinic and was observed to have "lice eggs in her hair" and "bruising/red marks on her ears," a "bruising pattern" on her leg, and "healed scratch marks on her arm." (Complaint at ¶ 12).

{¶ 5} LCCS immediately filed a Complaint in Dependency and Neglect and Abuse. In addition to the allegations set forth above, the agency claimed that, based upon

2.

its investigation, the children had been "removed multiple times" while living in Texas and that the children were in father's custody though an agreed-upon conservatorship with Texas Child Protective Services ("TCPS"). Reportedly, TCPS had an open case involving a third child, a younger sibling of the children, and the parents had a history of domestic violence with one another and mental health issues.

{¶ 6} Following an emergency shelter care hearing on February 8, 2022, the children were ordered into LCCS's temporary custody and placed with a foster family.

{¶ 7} An adjudicatory hearing was held on March 31, 2022, after which the juvenile court determined that the children were dependent, neglected, and abused. Father attended the hearing at the courthouse, where he was apprehended. He was then extradited to Texas to face criminal charges there. The juvenile court ordered that father and his girlfriend's mother have "no contact" with the children.

{¶ 8} Over a year later, on May 17, 2023, LCCS moved for permanent custody of J.K.-S. and J.So. As to father, LCCS alleged that he was incarcerated in Texas and that he had failed to engage in case planning services or to maintain contact with the agency.

{¶ 9} A disposition hearing was held on August 1, 2023. Father did not attend the hearing but was represented by counsel who verified that father was incarcerated in Texas "and has been for some time." Counsel also expressed father's desire to "raise the children himself."

{¶ 10} Mother attended the hearing and was represented by separate counsel. At the outset, mother "agree[d]" to a grant of permanent custody to LCCS and indicated that

3.

she wished to waive her right to a hearing. Following a colloquy with the court on that issue, mother's waiver was accepted, and she and counsel were excused.

{¶ 11} As to LCCS's motion, the agency offered "over 800 pages" of records from TCPS, documenting that the Texas agency has been working with the family since J.K.-S. was born and that, when the family had lived there, J.K.-S. had been removed twice and Jo.S. had been removed once. The ongoing case-worker, Jessica Gannon, testified at hearing that, based upon her review of hospitalization records, father inflicted "numerous injuries" against mother, some of which required hospitalization.

{¶ 12} Gannon confirmed that the "no contact order," prohibiting any contact between father and the children, has remained in effect since March of 2022. She argued in favor of continuing the order, irrespective of whether permanent custody was granted to LCCS. Gannon testified that the children have "verbalized" their wish not to see father. She testified that J.K.-S. "is adamant that he does not want to see his father" and that he has "consistently reported that the laceration on his head is from his father dunking his head in the toilet." She explained that each child used the term "booped" to describe "how the bruising happened on [J.K-S.]" and that they spoke of "various times of being fearful of getting booped again."

{¶ 13} As for case-planning, Gannon testified that LCCS initially included father in the case plan and asked him to complete a dual diagnostic, which he "completed at a different agency." But, within a month of the assessment, father was arrested and transported back to Texas. As a result, father was removed from the case plan, in April

4.

of 2022. According to Gannon, father was incarcerated from March to May of 2022, and then again "for a week or two" in October of 2022. He was arrested on April 4, 2023, and "remained incarcerated since [then]." Gannon confirmed that, as of the August 1, 2023 hearing date, father was "awaiting sentencing" on six charges: a felony charge of publishing intimate material, three assault charges, a violation of protective order, and an unlawful restraint charge. The victims of those offenses were father's girlfriend and his ex-wife, i.e. the children's mother. Before father stopped communicating with LCCS, he expressed to Gannon on "numerous occasions" that he "does not want anyone to raise [the children] but himself."

{¶ 14} As for the children, Gannon testified that they have remained with the same foster family since their removal. She described J.K.-S.'s facial scar as "pretty long," which he is "very aware of" and "[talks] about." In the beginning of the case, the children acted "very fearful" and would "flinch" at loud noises. And, "[i]f they did something wrong, they would immediately apologize and sometimes break down in tears." Gannon testified that J.K.-S. "consistently talk[ed] about the abuse that had occurred to him." However, Gannon also said that the children "have started * * * to move past [the abuse]." Gannon described the "very positive progress" that she observed, which included the children "play[ing] with one another" and "talk[ing] to one another as siblings their age would." She opined that the children are "thriving" and "extremely bonded" with their foster parents. Gannon testified that it would be in the children's best interest for permanent custody to be granted to LCCS.

5.

{¶ 15} The GAL concurred. She recommended that permanent custody be awarded to LCCS, due to the "severity of the violence in this case" and her "significant safety concerns [for] the children if they were ever returned to the state of Texas." In her report, the GAL described father as a "smooth talker, manipulative of the system [who] has consistently gotten away with not only hurting women but vulnerable children."

{¶ 16} The GAL testified that, when she first met the children just after their removal, J.K-S. "would just talk and talk and talk about what his father had done to him." Jo.S. was "very, very timid and shy," and "[a]nytime she met a new person, she was clinging onto foster mother, concerned that she was going to be taken away." The GAL credited the "incredibly patient" foster parents for helping the children heal from their abusive past. She testified that the children are "now * * * acting like children should * * * [by] spending time just being kids. * * * They're just completely different children."

{¶ 17} By judgment dated August 11, 2023, the trial court found that the children cannot be placed with either parent within a reasonable time or should not be placed with either parent and, specifically as to father, that he had abandoned the children. The court also found that a grant of permanent custody to LCCS was in the children's best interest. All of the court's findings were by clear and convincing evidence.

{¶ 18} Father appealed. He raises a single assignment of error for our review:

> I. The trial court abused its discretion when it granted permanent custody to Lucas County Children Services arguably without making "intensive efforts" to find a suitable kinship placement for the children.

6.

## II. Analysis

{¶ 19} Parents have a fundamental liberty interest in the care, custody, and control of their children. *In re K.H.*, 2008-Ohio-4825, ¶ 39. However, the right to parent one's children is not absolute; it does not give a parent a right to abuse or neglect a child. *Id.* at ¶ 40. And, the state has broad authority to intervene to protect children from abuse and neglect. *In re C.F.*, 2007-Ohio-1104, ¶ 28, citing R.C. 2151.01. "An award of permanent custody, which terminates parental rights, is a last resort and is only justified when it is necessary for the welfare of the child." (Citation omitted.) *In re L.R.-L.,* 2023-Ohio-2071, ¶ 24 (10th Dist.). Because granting permanent custody terminates parental rights, "parents 'must be afforded every procedural and substantive protection the law allows.'" *In re Hayes*, 79 Ohio St.3d 46, 48 (1997), *superseded by statute,* quoting *In re Smith*, 77 Ohio App.3d 1, 16 (6th Dist.1991).

{¶ 20} A juvenile court may grant permanent custody of a child to a public children services agency "if the court determines * * *, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency * * * and that any of the following apply:"

(a) * * * [T]he child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

(b) The child is abandoned.

7.

(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *.

(e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

R.C. 2151.414(B)(1)(a) through (e).

{¶ 21} Once the juvenile court concludes that one of the circumstances in R.C. 2151.414(B)(1) applies, the court analyzes R.C. 2151.414(D) to decide if a grant of permanent custody is in the child's best interest. Pursuant to R.C. 2151.414(D)(1), the juvenile court "shall consider all relevant factors, including, but not limited to, the following:"

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D)(1)(a) through (e).

{¶ 22} All of the court's findings under R.C. 2151.414 must be by clear and convincing evidence. "Clear and convincing evidence" is evidence sufficient for the trier of fact to form a firm conviction or belief that the essential statutory elements for a termination of parental rights have been established. *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus; *In re Tashayla S.*, 2004-Ohio-896, ¶ 14 (6th Dist.).

{¶ 23} The Ohio Supreme Court recently clarified the standard of review in permanent custody cases. In *In re Z.C.,* 2023-Ohio-4703, the court held that, "[g]iven that R.C. 2151.414 requires that a juvenile court find by clear and convincing evidence that the statutory requirements are met, we agree with those appellate courts that have determined that the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence

9.

standards of review are the proper appellate standards of review of a juvenile court's permanent-custody determination, as appropriate, depending on the nature of the arguments that are presented by the parties." *Id.* at ¶ 11 (Rejecting abuse-of-discretion standard in termination proceeding). Sufficiency of the evidence and manifest weight of the evidence are "distinct concepts and are 'both quantitatively and qualitatively different.'" *Id.* ¶ 13 quoting *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 10, quoting *State v. Thompkins*, 78 Ohio St.3d 380 (1997), paragraph two of the syllabus. "We have stated that 'sufficiency is a test of adequacy,' * * * while weight of the evidence 'is not a question of mathematics, but depends on its *effect in inducing belief*.'" (Emphasis sic.) *Id.* quoting *Thompkins* at 387, quoting *Black's Law Dictionary* (6th Ed.1990)

## A. The Juvenile Court's Findings

{¶ 24} As to the first element, the juvenile court found that *two* R.C. 2151.414(B)(1) provisions applied: Section (B)(1)(a) as to both parents and Section (B)(1)(b) as to father.

{¶ 25} Under Section (B)(1)(a), when determining whether the children "cannot * * * or should not be placed with the child[ren's] parents," the court "shall consider all relevant evidence." If the court determines that "one or more" of the factors under Section (E)(1)-(16) exist as to either parent, the court "shall" enter a finding that the children cannot or should not be placed with that parent. Here, the court considered and found that R.C. 2151.414(E)(1) applied as to both parents; that R.C. 2151.414(E)(10) and (12) and (13) applied to father; and that R.C. 2151.414(E)(16) applied to mother.

10.

{¶ 26} Specifically as to father, the court found that, under R.C. 2151.414(E)(1), father "failed continuously and repeatedly to substantially remedy the conditions" causing the children's removal, by "fail[ing] to engage [and] complete" case management services and by "remain[ing] incarcerated almost the entire case." J.E. at 6. The court also found that father "abandoned" the children under R.C. 2151.414(E)(10) by failing to visit or maintain contact with them "for more than ninety days," specifically finding that father had no contact with the children since the March 31, 2022 adjudication, a period of 16 months. J.E. at 7, citing R.C. 2151.011(C) ("[A] child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days."). Next, the court found, under R.C. 2151.414(E)(12), that father "is incarcerated" and "will not be available to care for the [children] for at least [18] months after LCCS filed the Motion for Permanent Custody and the dispositional hearing." J.E. at 7-8. Finally, the court found, under R.C. 2151.414(E)(13), that father "is repeatedly incarcerated [which] prevents [him] from providing care for the children." J.E. at 8.

{¶ 27} Separately, the court found that a second provision applied—as to the first element and specifically as to father—for his "abandonment" of the children. R.C. 2151.414(B)(1)(b).

{¶ 28} As to the second element, the trial court found that a grant of permanent custody to LCCS was in the children's best interest, under R.C. 2151.414(D)(1). Under Section (D)(1)(a), regarding "the interaction and interrelationship of the [children]," the court found that the children were "making positive progress" and "thriving" under their

11.

foster parents' care, that the children and foster-parents were "bonded" with each other, and that the foster parents "have ensured that all the children's needs have been met both physically and emotionally." Under Section (D)(1)(b), regarding the "wishes of the children," the court found that the children "do not want contact with their father" and that J.K.-S. is "adamant that he does not want to see his father" and that he "continues to talk about the abuse that took place in his father's home and under his father's watch." Under Section (D)(1)(c), regarding the custodial history of the children, the court found that the children "have spent more time outside of their parents' care and custody than in their parents' custody during their lives" and that the children have remained in their current foster caregivers' home "during the entire case." Under Section (D)(1)(d), regarding "the need for a legally secure placement and whether that type of placement can be achieved without a grant of permanent custody," the court found that the children "need and deserve a forever home" and that the foster parents are "interested in adopting the children." Finally, under Section (D)(1)(e), whether any of the factors in R.C. 2151.414(E)(7)-(11) apply "in relation to the parents and child," the court found that father "abandoned" the children under Subsection (E)(10). J.E. at 10-11.

{¶ 29} All of the court's findings were by clear and convincing evidence.

{¶ 30} On appeal, father does not contest any of the trial court's findings. Father's only argument on appeal is that LCCS failed to comply with R.C. 2151.4116 ("Kinship Caregiver Act."). Accordingly, we confine our decision to that issue. *Accord In re A.M,* 2020-Ohio-5102, ¶ 18.

12.

**B. The Kinship Caregiver Act**

{¶ 31} In his sole assignment of error, father argues that the trial court "abused its discretion" when it granted permanent custody to LCCS because the agency "arguably" failed to comply with the Kinship Caregiver Act.

{¶ 32} Again, we do not review for an abuse of discretion. Rather, the sufficiency and manifest weight of the evidence "are the proper appellate standards of review" in a permanent custody determination. *In re Z.C.* at ¶ 11. However, because father failed to raise the issue of the Kindship Caregiver Act to the juvenile court, he has forfeited all but plain error. *In re A.M.,* 2024-Ohio-1164, ¶ 47 (8th Dist.) ("We note at the outset that mother did not raise the Kinship Caregiver Act to the juvenile court. She has therefore forfeited all but plain error."); *See also*, *In re. M.K.,* 2023-Ohio-3786, ¶ 41 (5th Dist.) The plain-error doctrine is applicable in civil cases, only in the extremely rare case where the error "seriously affects the basic fairness, integrity, or public reputation of the judicial process." *In re A.D.,* 2023-Ohio-2442, ¶ 82 (3d Dist.), quoting *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 122-123.

{¶ 33} The Kinship Caregiver Act, set forth in R.C. 2151.4115 through 2151.4122, became effective on September 30, 2021. *See* 2021 Am.Sub.H.B. No. 110. The law requires a public children services agency, such as LCCS, to "make intensive efforts to identify and engage an appropriate and willing kinship caregiver for the care of a child who is in [the] [t]emporary custody of the agency." R.C. 2151.4116(A). A "kinship caregiver" includes individuals related to the child by blood or adoption, such as

13.

grandparents or siblings, as well as stepparents and stepsiblings, legal custodians or guardians, and "[a]ny nonrelative adult that has a familiar and long-standing relationship or bond with the child or the family, which relationship or bond will ensure the child's social ties." 5101.85; R.C. 2151.4115(A)(1) (adopting the definition of "kinship caregiver" in R.C. 5101.85 for application to R.C. 2151.4116 through 2151.4122).

{¶ 34} Importantly, the purpose of the law is to "compel agencies to exercise intensive efforts to place children who are in the agencies' *temporary custody* in kinship care rather than in foster care." (Emphasis added.) *In re L.R.-L.*, 2023-Ohio-2071, ¶ 18 (10th Dist.) citing R.C. 2151.4116; *see also In re. M.K.*, 2023-Ohio-3786, ¶ 42 (5th Dist.). Because the law applies during an agency's exercise of temporary custody over a child, "[o]nce a child enters the permanent custody of a public children services agency, the question of whether the child should reside in foster care or with a kinship caregiver while the child is in the agency's temporary custody becomes moot." *Id.;* accord *In re. M.K.* at ¶ 42; *In re A.M.,* 2024-Ohio-1164, ¶ 62. That is the situation here. The trial court's August 1, 2023 ruling that granted LCCS's motion for permanent custody of the children rendered moot the question of who should have cared for the children while they were in the agency's temporary custody.

{¶ 35} Father could have appealed the trial court's May 13, 2022 judgment adjudicating the children as dependent, neglected and abused, and disposition awarding temporary custody to LCCS. "An adjudication by a juvenile court that a child is 'neglected' or 'dependent' as defined by R.C. Chapter 2151 followed by a disposition

awarding temporary custody to a public children services agency, constitutes a 'final order' within the meaning of R.C. 2505.02 and is appealable to the court of appeals under R.C. 2501.02. *In re Murray,* 52 Ohio St.3d 155 (1990). Moreover, "decisions from several Ohio appellate courts suggest that an order *extending* temporary custody may be a final, appealable order when appealed by a parent." (Emphasis added.) *In re Bil.I.,* 2023-Ohio-434, 208, ¶ 30, fn. 4 (10th Dist.) *appeal not allowed*, 2023-Ohio-1830, citing *In re Patterson*, 16 Ohio App.3d 214, 215 (12th Dist.1984) (holding that a further dispositional order continuing an original temporary custody order was a final, appealable order because it was inextricably a part of, incidental to, and in implementation of the original judgment); *see also Murray* at 159, fn. 2 (favorably citing *Patterson*); *See also, In re N.C.*, 2022-Ohio-4569 (11th Dist.) (holding that an extension of a temporary custody order issued subsequent to a finding of dependency, neglect, or abuse is a final, appealable order); *In re D.M.*, 2018-Ohio-2260, ¶ 15 (12th Dist.) (Citing *Patterson* and holding that "an additional dispositional order continuing an original temporary custody order constitutes a final appealable order"); *In re Di.R.*, 2005-Ohio-5346, ¶ 30 (8th Dist.) (citing *Patterson* and holding that "any order extending an original temporary custody order is itself a final appealable order").

**{¶ 36}** In sum, father should have raised the issue of whether LCCS complied with R.C. 2151.4116 during the agency's *temporary* custody over the children. He did not, and that issue is now moot.[1]

### III. Conclusion

**{¶ 37}** R.C. 2151.4116 requires public children service agencies to make intensive efforts to identify and engage an appropriate and willing kinship caregiver when a child is in its temporary custody. Once a child enters the permanent custody of a public children services agency, the question of whether the child should reside in foster care or with a kinship caregiver while the child is in the agency's temporary custody becomes moot. In this case, the trial court's August 1, 2023 ruling that granted LCCS's motion for

---

[1] Even if not moot, we note that the record is replete with evidence of LCCS's efforts to identify and engage an appropriate kinship caregiver. For example, the juvenile court conducted a "Kinship Caregiver Intensive Efforts Review," noting that "since the last hearing, LCCS has made the following efforts to place the child(ren) with a Kinship Caregiver: expedited home study to be completed re. Mother in Texas." *See* May 13, 2022 J.E. Indeed, on two occasions, LCCS moved the trial court to order an expedited home study of mother's home in Texas. *See* Apr. 4 and Aug. 23, 2022 motions. While the motions were granted, the Texas agency denied the home studies, based upon "concerns for mother's mental health [and] significant domestic violence history." Aug. 1, 2023 Tr. at 33. With mother eliminated as a potential caregiver, LCCS engaged its "Family Search and Engagement unit" to conduct "an ongoing relative search." *See* Dec. 6, 2022 motion to continue temporary custody. Ultimately however, LCCS "completed" its "relative search and study," having found "no relatives identified who are able, willing, and/or approved for placement," including the children's maternal and paternal grandmothers. *See* May 17, 2023 motion for permanent custody. While father speculates that LCCS did not contact "other individuals" within his or mother's extended family, he fails to identify any particular potential caregiver, and no other caregivers are identified in the record, other than those who were deemed inappropriate.

16.

permanent custody of the children rendered moot the question of who should have cared for the children while they were in the agency's temporary custody.

{¶ 38} Accordingly, we find father's assignment of error not well-taken, and we affirm the juvenile court's August 11, 2023 judgment.  Father is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Christine E. Mayle, J.                  _____
JUDGE

Gene A. Zmuda, J.           

Charles E. Sulek, P.J.         _____
CONCUR.
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.